United States District Court
Southern District of Texas
**ENTERED**
May 18, 2023
Nathan Ochsner, Clerk

# In the United States District Court
# for the Southern District of Texas

GALVESTON DIVISION

No. 3:23-cv-112

SHINTECH INCORPORATED, *PLAINTIFF*,

v.

OLIN CORPORATION, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Shintech Incorporated contracted with Blue Cube Operations LLC, a wholly owned subsidiary of Olin Corporation, to buy more than 1.5 billion pounds of vinyl chloride monomers ("VCM") yearly from 2021 to 2030. Dkt. 15-1. Olin guaranteed Blue Cube's performance under the contract. *Id.* at 22. In March 2023, Olin and Blue Cube announced their refusal to supply any more VCM to Shintech because of an unresolved $18 million payment dispute between the parties. Dkt. 15-2 at 29. Shintech has now asked the court to (1) preliminarily enjoin Olin and Blue Cube's alleged repudiation of the parties' contract and (2) order them to specifically perform under the contract until the case is resolved. Dkt. 17 at 24. The court denies that motion.

1/22

## I. Background

### 1. The Parties

Shintech is the largest polyvinyl chloride ("PVC") producer in the United States.[1] Dkt. 15 ¶ 26. Manufacturers like Shintech polymerize VCM to make PVC. *Id.* Shintech needs an ample, reliable VCM supply to meet its customers' demands. *Id.* Blue Cube, a wholly owned subsidiary of Olin, provides VCM to Shintech. *Id.* ¶ 12.

### 2. The Sales Contract

#### a. Terms

In ▮▮▮▮▮▮▮▮, Shintech entered a sales contract with Blue Cube to supply large quantities of VCM between ▮▮▮▮▮▮▮▮. Dkt. 15-1 at 1–3. Under the contract, Shintech must notify Blue Cube by June 30 of the preceding year of the VCM volume it wants to buy for the upcoming year. *Id.* at 1. From 2021 to 2023, Shintech had to buy at least ▮▮▮▮▮▮▮▮ of VCM annually. *Id.* After receiving that request, Blue Cube has until August 31 to tell Shintech the volume it would supply. *Id.* Blue Cube agreed to provide at least ▮▮▮▮▮▮▮▮ of VCM each year during that time (and no more than the amount Shintech requested). *Id.* ▮▮▮▮▮▮▮▮

---

[1] PVC is a "resin chiefly used in the manufacture of PVC pipe, vinyl siding, window profiles, fencing, and film wrap." Dkt. 15 ¶ 26.

██████████████████████████████████████████████.

*Id.* at 4.

Shintech and Blue Cube operate separate chemical plants in Freeport connected by a 1.3-mile pipeline. Dkt. 15 ¶¶ 23, 29–30. The contract requires Blue Cube to deliver the VCM through that pipeline. *Id.* at 2. Olin has guaranteed Blue Cube's performance. *Id.* at 3, 22–24. Texas law governs the contract between the parties and the guarantee. *Id.* at 7, 23.

### b. Pricing

The contract has no fixed price for the VCM that Blue Cube sells Shintech. Instead, it follows a complicated pricing formula and invoicing procedure that includes "all of the components in the integrated PVC [supply] chain." *See id.* at 11.

At the end of each month, Blue Cube initially invoices Shintech at an estimated price for the VCM it sold. *Id.* at 9. Twenty-six days later, the parties then must provide each other various payments: As defined by the contract, Shintech must generally pay Blue Cube a "PVC net back" for the PVC it produces, while Blue Cube must pay Shintech a "caustic net back" for the caustic soda produced by Blue Cube. *Id.* at 9, 13–16. Blue Cube also may adjust the VCM's base price at the end of each month, quarter, and year based on the contract's pricing formula before issuing the appropriate debits and

credits. *Id.* at 9–17. If either party disputes a PVC net back or caustic net-back's accuracy, the party has a "right to request and receive a statement of audit" performed by the other party's independent public accountant. *Id.* at 20.

### c. Dispute Resolution

The parties agreed to resolve "[a]ny and all controvers[ies], claim[s,] or dispute[s] . . . arising out of or relating to any provision of [the contract], or the breach, termination[,] or the validity thereof," under the contract's dispute-resolution procedure. *Id.* at 7, 21. If a dispute arises between the parties, they are to follow several steps:

- To start, either party must request in writing for the parties' senior executives to resolve the dispute. *Id.* at 21. The request must outline the "details of the controversy." *Id.*

- Within thirty days, the party receiving the request must respond in writing, detailing its position and summarizing the arguments supporting its position. *Id.*

- Finally, the parties' senior executives must meet in person within 60 days of the request "to attempt in good faith to resolve the controversy." *Id.* The parties agree to provide all information related to the dispute before the meeting. *Id.*

- If the parties fail to resolve the dispute within seventy-five days of the request or fail meet within sixty days of the request, then either party may sue. *Id.*

The contract provides that not "strictly comply[ing] with the processes and timing" outlined above is a material breach "entitling the non-breaching

[p]arty to suspend performance." *Id.* However, either party may "apply to a court of competent jurisdiction for a . . . preliminary injunction[] or other interim or conservatory relief, as necessary to enforce" the contract. *Id.*

### d. Major Turnarounds

Finally, the contract contemplates Blue Cube needing to suspend delivery to perform maintenance on its Freeport facility. Blue Cube may take a ███████ planned outage, known as a "major turnaround," once every three years. *Id.* at 1–2. During this time, Blue Cube may suspend VCM deliveries to Shintech. *Id.* at 2. Following a major turnaround, Blue Cube must "make reasonable efforts to supply" the shortfall of VCM throughout the following year. *Id.*

In August 2022, Olin elected to perform its 2023 major turnaround on ███████, and anticipated it would take f███████ to complete. Dkt. 15-2 at 27. Shintech agreed to this duration. *Id.* at 25. On April 17, 2023, Olin told Shintech not to expect the major turnaround to be complete "███████t." Dkt. 17-1 at 43. At the court's May 10 hearing on the motion for preliminary injunction, Blue Cube testified that the turnaround would not be complete at least until ███████ Dkt. 43 at 147–48.

### 3. The Dispute

A dispute arose over the contract's 2022 pricing. Dkt. 15 ¶¶ 31–32. On March 13, 2023, Olin executive Patrick Schumacher emailed Shintech executive Toshiaki Ansai. Dkt. 15-2 at 29–30. Schumacher claimed that Shintech owed Olin $18 million based on a (1) $12 million debit in the PVC-net-back payment, (2) $5 million credit in the caustic-net-back payment, and (3) $1 million discrepancy in the pricing formula. *Id.* at 29. Accusing Shintech of intentionally breaching the contract, Schumacher informed Ansai that Blue Cube "will not provide [VCM] . . . unless these matters have been fully resolved." *Id.* Schumacher also refused to follow the dispute-resolution process because he believed Shintech's breach was "intentional" and that the dispute-resolution process is for "smaller day[-]to[-]day disagreements." *Id.*

Four days later, Shintech responded to Schumacher's email "categorically reject[ing] Olin's] unilateral attempt to cancel the existing nomination and threat to suspend deliveries." *Id.* at 36–37. It also invoked its rights under the dispute-resolution process. *Id.* at 37. Olin replied four days later, reiterating its initial claims but indicating a willingness to try to resolve the dispute. *Id.* at 31. To date, the parties continue to try to resolve

this outside of litigation. *Id.* at 32–34; Dkt. 17-1 at 41–42. Neither Blue Cube nor Olin have invoked an audit. *See* Dkt. 15 ¶ 32.

### 4. This Lawsuit

On April 14, Shintech sued the defendants for breach of contract. Dkt. 3 ¶¶ 25–30. Shintech also seeks a declaratory judgment that the defendants (1) materially breached and repudiated the contract and (2) must continue to supply Shintech VCM. *Id.* ¶ 24. Shintech also prays for specific performance under the contract, injunctive relief, attorneys' fees, and costs. *Id.* ¶¶ 31–36. After suing, Shintech moved to preliminarily enjoin the defendants from not performing under the contract. Dkt. 6.

Shintech has amended its complaint and motion for preliminary injunction. Dkts. 15, 17. The defendants have responded, Dkts. 28, 29, and Shintech has replied, Dkts. 30, 31. After reviewing the parties' filings, the court convened a hearing on May 10, where it heard evidence and all parties presented argument.

## II. Legal Standard

A party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Direct Biologics,*

*L.L.C. v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A preliminary injunction is "an extraordinary and drastic remedy" that a court should not grant unless "the movant, by a clear showing, carries the burden of persuasion." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). The decision to grant or deny a preliminary injunction "lies within the sound discretion" of this court. *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *3 (5th Cir. Feb. 17, 2022) (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)).

## III.  Analysis

The defendants assert that Shintech has not carried its burden of persuasion on each factor necessary for the court to grant preliminary relief. Because the court finds that Shintech has not adequately demonstrated irreparable harm, it denies Shintech's motion for preliminary injunction.

### A. The Parties' Arguments

A harm is irreparable when "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "[M]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sambrano*, 2022 WL 486610, at *6 (quoting *Sampson v. Murray*, 415 U.S. 61, 90

(1974)). When determining irreparability, "it is not so much the magnitude but the irreparability that counts." *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016). Additionally, "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). A plaintiff must demonstrate that irreparable harm is not just possible but likely. *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F. Supp. 3d 701, 720 (E.D. Tex. 2020).

Shintech carries the burden of demonstrating that it faced a substantial threat of suffering irreparable harm, with no adequate remedy at law, absent an injunction ordering specific performance. *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). It argues that Blue Cube cutting off VCM supply "will be devastating to [Shintech's] business" because it is the only merchant seller of VCM in the United States. Dkt. 17 at 6. While Shintech produces some VCM at its plant in Plaquemine, Louisiana, it contends that its own production volume accounts for only around 50% of the ███ pounds of VCM Shintech currently requires. *Id.* at 4. Blue Cube supplies the other 50%, and Shintech "has no ability to fulfill its VCM needs without its supply from" Blue Cube. *Id.* at 8. Although Shintech acknowledges that it could conceivably purchase a fraction of the

shortfall via supply agreements with competitors, it argues that these competitors cannot sell the large volumes Shintech needs and are unlikely to assist it. *Id.* Finally, it presents evidence that the infrastructure to ship VCM from an alternative supplier's plant to Shintech's Freeport plant does not exist. *Id.* Even if it did, VCM is not commercially available in the large volume Shintech requires. *Id.*

Shintech warns that it "is at risk of losing approximately $2,000,000.00 per day in sales revenue and likely even more given market conditions" without Blue Cube's VCM. *Id.* at 22. Beyond these monetary damages, Shintech identifies looming irreparable harm in the form of "disruption to [its] Texas operations and its inability to meet customer demand," implicating the company's goodwill and reputation with existing and future business prospects. *Id.* at 22–23. It also fears reduced market share. Dkt. 30 at 22. Shintech asserts that monetary relief is inadequate to remedy these harms. Dkt. 17 at 22–23.

In response, Blue Cube disputes its status as the only merchant seller of VCM in the United States. It provides evidence that Shintech could obtain VCM through other domestic and international sources, including Shintech's parent company operating plants in Europe and Japan. Dkt. 29 at 28. Blue Cube says that Shintech could also satisfy its VCM needs by increasing

production output at the Plaquemine plant. *Id.* at 28–29. It points to industry data indicating that VCM production facilities in the United States operate below maximum capacity, and surmises that the Plaquemine plant could also increase production. *Id.* at 29. Blue Cube disputes the logistical unfeasibility of transporting more VCM from alternate suppliers via rail, relying on a map of Shintech's Freeport plant to argue that "Shintech has a high-degree of ability to receive and store railcars on it[s] site." *Id.* By Blue Cube's lights, the map also shows that Shintech has significant VCM storage capacity on site. *Id.*

Additionally, Blue Cube argues that Shintech has the capacity to accept all the VCM it needs via railcar, assuming that it can unload twenty-four railcars in twenty-four hours. *Id.* at 30. Blue Cube submits that Shintech "paints a worst-case scenario that assumes it will take no actions to mitigate the loss of VCM" and is essentially creating its own irreparable harm. *Id.* at 26. And in any event, Blue Cube observes that Shintech "does *not* sell VCM. Shintech sells *PVC*, a *non-unique pro*[*duct*]. Shintech could purchase PVC from other producers and resell this PVC to fulfill any existing obligations." *Id.* at 30.

Blue Cube also says that Shintech's alleged damages are quantifiable, pointing to Shintech's own $2,000,000-per-day estimate for lost revenue.

*Id.* As quantifiable money damages could adequately compensate Shintech, Blue Cube argues, there can be no irreparable harm. *Id.* at 30–31.

### B. The Evidence

To carry its burden of establishing a substantial threat of irreparable harm, Shintech provides testimony from executives Toshiaki Ansai and Steve Polito. Dkts. 17-1 at 2; 30 at 21; 30-1 at 68. Ansai asserts that "the continued viability of Shintech's Texas operations is reliant on the supply of VCM from" Blue Cube. Dkt. 17-1 at 5–6. He says that "other companies that produce VCM do so almost exclusively for producing and selling PVC, and they do not enter into supply agreements with competitors like Shintech." *Id.* at 6. And even if Shintech could buy some VCM, the logistics of transporting it are impractical because "there is no existing infrastructure to ship VCM from an alternative supplier's plant." *Id.* Ansai reiterates that Shintech stands to lose at least $2 million per day without Blue Cube's VCM, and "is in danger of harming its reputation and goodwill." *Id.*

Ansai's supplemental declaration provides more detail. Dkt. 30 at 21. He declares that PVC producers in the United States in 2022 had the capacity to produce about 19.8 billion pounds of PVC. *Id.* Shintech had a PVC production capacity of about 7.145 billion pounds, representing a 36% share. *Id.* Ansai estimates that losing Blue Cube's VCM supply will reduce

Shintech's PVC production share by about ▮% because Shintech's annual production capacity would fall to about ▮▮▮▮ pounds while its competitor's capacity would remain the same. *Id.* at 21–22. This loss would reduce Shintech's market share. *Id.* at 22. Though Ansai says that Shintech has entered logistically difficult "tolling agreements" with competitors in the past to obtain relatively small amounts of VCM, these amounts are wholly insufficient to satisfy Shintech's need. *Id.* at 23. Also, the availability of entering even these minor tolling agreements has been cast into doubt; Shintech recently received correspondence from a competitor asking if *Shintech* could sell any VCM. *Id.* Ansai reiterates that the logistics of transporting VCM to Freeport—by rail or by vessel—are impractical. *Id.* at 24–25. Moreover, the Plaquemine plant is already producing at capacity; doubling output to make up for the lost VCM would take years of planning and carries safety implications. *Id.* at 24. A massive and sudden loss of VCM places Shintech "into a state of chaos[,] and the short-term and long[-]term effects put [Shintech] in significant danger of having [its] reputation harmed, which would result in market share loss." *Id.* at 25.

Additionally, Ansai says that purchasing PVC from competitors to fulfill Shintech's customer obligations is impractical for three reasons. First, their competitors have no incentive to help Shintech and might not sell to

them. *Id.* at 24. Second, even if Shintech could make these purchases, "it would have to do so at the market price" and could not build in a margin on resale. *Id.* Finally, Shintech's customers buy PVC made by Shintech to meet specifications that cannot be easily or quickly substituted elsewhere. *Id.*

Polito describes in his declaration how the Plaquemine plant already operates at full capacity, and "that there is no more VCM to produce in Louisiana without expanding [Shintech's] production capacity." Dkt. 30-1 at 68. Polito notes that Shintech recently completed construction of a VCM plant in Plaquemine, which took over two years to construct. *Id.* Polito also disputes the logistical feasibility of transporting millions of pounds of VCM to the Freeport plant by rail or by vessel. *Id.* at 69. He states that the on-site rail activity at Freeport is already "regularly approaching gridlock status," and Shintech simply does not have the infrastructure in place to receive millions of additional pounds of VCM per day via rail to Freeport. *Id.* Polito casts doubt on the suggestion that any of Shintech's competitors would or could supply it with the necessary amounts of VCM without avoiding the logistical headache. *Id.*

At the May 10 hearing convened by the court, Ansai and Polito both testified. Ansai testified that Shintech "has quite a good reputation in the PVC industry." Dkt. 43 at 35. He attributed this to the fact that Shintech's

"supply of PVC . . . is very stable and the reason is Shintech is highly
disciplined to maintain its PVC production capacity." *Id.* Ansai observed that

> "historically, the other PVC competitors had so many production
> problems and accordingly . . . our competitors' PVC customers have
> suffered a sometimes[-]lower supply of PVC product or the delay of
> delivery . . . Shintech always responsibility supplies our products to the
> customers; and then, we earned such a good reputation."

*Id.* at 35–36. Ansai noted that many customers require "a very good quality
and a preciseness of delivery of their products. And that is why they really
appreciate our stable supply and timely delivery." *Id.* at 36–37. He testified
that the operational and supply problems encountered by Shintech's
competitors have, in the past, delivered customers to Shintech. *Id.* at 44.

Ansai testified the company has already begun "carefully explaining
our challenging situation to customers not to worry," because without Blue
Cube's VCM Shintech "will have to cut back [its] supply to many customers
of a quite large volume of business." *Id.* at 45–46. Ansai testified that
Shintech will have issues with customer contracts if it cannot meet their
supply requirements. *Id.* at 46. He also noted that PVC was a "unique
product," and that many of Shintech's customers ordered PVC with specific
characteristics and requirements. *Id.* at 47. And while some customers could
use the products of competitors as a substitute for Shintech products, "many
customers . . . are very much requiring specifically Shintech's products." *Id.*

at 47–48. He also reiterated that the Plaquemine plant could not ramp up production to make up for the loss of the Blue Cube-supplied VCM, and that Shintech's competitors likely could not and would not supply it with additional VCM. *Id.* at 40–41.

At the same hearing, Steve Polito testified to the logistical complications and unfeasibility of transporting via rail, truck, or vessel the amount of VCM needed by Shintech. *Id.* at 94–97. He also testified that the Plaquemine plant could not expand capacity to make up for the lost VCM. *Id.* at 94, 97–98.

### C. Irreparable Harm

Considering the evidence and arguments of counsel, the court finds that Shintech has failed to establish a substantial threat that it will suffer irreparable harm absent the "extraordinary" remedy of a preliminary injunction. *See Succession of Roy*, 777 F.2d at 997.

Although Shintech has provided evidence that it will encounter difficulties procuring VCM in the volume supplied by Blue Cube, this is insufficient on its own to prove irreparable harm. Shintech's projected revenue losses of at least $2 million per day from diminished production capacity cannot constitute irreparable harm because they are obviously

quantifiable and compensable by monetary damages.[2] Ansai declares that the $2 million figure is only an estimate of revenue losses "based on current market conditions" and "not our actual losses or damages, which cannot reasonably be predicted . . . because the market will change, costs will change, new companies may enter or exit the market, etc." Dkt. 31 at 25. But the thrust of this assertion is that Shintech cannot currently determine the *magnitude* of its loss, not that the injury is inherently unquantifiable or not compensable by money damages.

The irreparable-harm inquiry concerns injuries that are incapable of ascertainment, not damages that are currently (but will not always be) of indeterminate size. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm."). Shintech does not explain why the fact that costs and markets are in flux—as is true in any industry—means that it has no adequate remedy in a future

---

[2] While "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate,'" this case does not fall within any of the exceptions identified by the Fifth Circuit. *See Alguire*, 647 F.3d at 600 (discussing cases where "legal redress may be obtained only by pursuing a multiplicity of actions," or where "a meaningful decision on the merits would be impossible without an injunction").

damages award. If Shintech can quantify its revenue losses now based on current market conditions, the court fails to see why it could not quantify revenue losses in the future based on extant market conditions.

The other injuries identified by Shintech—loss of market share to competitors, destruction of customer goodwill, and damaged reputation—are the types that can potentially support a finding of irreparable injury. *BioTE Med., LLC v. Jacobsen*, 406 F. Supp. 3d 575, 584 (E.D. Tex. 2019); *Digital Generation, Inc. v. Boring*, 869 F. Supp. 2d 761, 778 (N.D. Tex. 2012). However, Shintech had an obligation to "come forward with evidence that [these injuries are] irreparable by showing that the loss cannot be measured in money damages." *Boring*, 869 F. Supp. At 777–78. Loss of customers and injuries to reputation and goodwill may "make the pecuniary injury difficult to calculate" but "would not constitute *per se* irreparable injury." *Millennium Rests. Grp., Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 666 (N.D. Tex. 2001) ("The plaintiffs . . . have not shown that they would suffer irreparable economic injury in this case. They have merely argued that [they] will . . . los[e] customers and good will."); *Azteca Enters., Inc. v. Dall. Area Rapid Transit*, No. CIV. A. 3:99–CV–0281P, 1999 WL 102803, at *3 (N.D. Tex. Feb. 23, 1999) (holding that "there is not a per se rule" that injuries to reputation and goodwill are always irreparable by a remedy at

law); *see also TIGI Linea Corp. v. Pro. Prods. Grp., LLC*, No. 4:20-cv-087, 2020 WL 3154857, at *4–5 (E.D. Tex. May 20, 2020).

Ansai's testimony and supplemental declaration raise the possibility of lost market share due to Shintech's lost production capacity, which in turn may cost Shintech customers and, consequently, its market share. Dkt. 43 at 44; Dkt. 30 at 22, 25. But Shintech does not adequately explain or give evidence showing why this is not quantifiable and compensable in terms of money damages.[3] *See Jacobsen*, 406 F. Supp. 3d at 585; *Global Consulting & Mech. Servs., LLC v. Austin*, No. 5:20-cv-88-RWS-CMC, 2020 WL 8267591, at *8 (E.D. Tex. Dec. 16, 2020); *BMC Software, Inc. v. Int'l Bus. Machs. Corp.*, No. H-17-2254, 2018 WL 4334055, at *9 (S.D. Tex. July 10, 2018) (holding, in the context of a tortious-interference claim, that the potential non-renewal of a contract "may be compensated with monetary damages"); *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *6 (E.D. Tex. Dec. 23, 2015) ("[L]ost

---

[3] Shintech cites articles defining market share, discussing the concept, and identifying the effect of market share on a business, including how market share can serve as a "benchmark" for a business to assess where it stands with customers. Dkt. 30 at 15 n.37. This is not evidence that Shintech's loss of production capacity, loss of ability to meet customer demand, and consequent loss of market share cannot be compensated by money damages.

market share and lost sales alone are insufficient to establish irreparable harm.").

Shintech's evidence for irreparable loss of good will and reputation comes from Ansai's testimony that the loss of VCM will damage the company's standing as a reliable product provider and disrupt the company's ability to timely provide customers with PVC. Dkt. 43 at 35–36, 45–46. Ansai also discusses how past supply failures by Shintech's competitors repelled customers. Dkt. 43 at 44. The court finds this testimony too speculative to justify the entry of a preliminary injunction. Ansai's description of what he has observed in the past is not necessarily a reliable indicator of what will happen in the future. Moreover, Shintech asserts that—but does not explain or provide evidence of why—the alleged loss of good will and reputation could not be compensated with money damages. *See Johnson Controls, Inc. v. Guidry*, 724 F. Supp. 2d 612, 620 (W.D. La. 2010) ("Simply arguing that a company is losing customers and goodwill without showing that monetary damages are an inadequate remedy is insufficient to establish irreparable harm.").

The court identifies another reason to doubt the existence of irreparable harm in this case. The defendants have stated that they will continue to withhold Shintech's supply of VCM "unless these matters have

been fully resolved" and that they "look forward to . . . payment of the above amount to resolve this matter." Dkt. 17-1 at 33. Presumably, Shintech could avoid all the harms it identifies by paying Blue Cube the amount in dispute. If Shintech prevails at a trial on the merits, that overpayment would be recoverable as damages with interest—an adequate remedy at law. *See Snecma v. Turbine Engine Components Technologies Corp.*, 531 F. Supp. 2d 354, 358 (N.D.N.Y. 2008) (holding that, where a buyer sought a preliminary injunction against a seller who attempted to raise prices beyond those contemplated by the contract, the buyer could "avoid the alleged irreparable harm—loss of credibility and good will—by paying the higher price, and then recover monetary damages on the merits"). Although distasteful, Shintech could avoid its alleged irreparable harm here by paying Blue Cube the amount it demands and continuing to pursue this lawsuit.

The court finds that Shintech has failed to show a substantial threat of irreparable harm. Accordingly, a preliminary injunction is unwarranted.

\* \* \*

For the foregoing reasons, the court denies Shintech's amended motion for preliminary injunction. Dkt. 17.

Signed on Galveston Island this 18th day of May, 2023.

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE