**In The United States District Court**
**For The Southern District Of Texas**
**Galveston Division**

| | | |
|---|---|---|
| Shintech Incorporated. | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 3:23-cv-112 |
| | § | |
| V. | § | HON.  JEFFREY V. BROWN |
| | § | |
| Olin Corporation | § | |
| and Blue Cube Operations LLC | § | |
| | § | |
| *Defendants*. | § | |

**Plaintiff Shintech Incorporated's Second Amended Complaint**

Plaintiff Shintech Incorporated ("Shintech" or "Plaintiff") files this Second Amended Complaint against Defendants Olin Corporation ("Olin") and Blue Cube Operations LLC ("Blue Cube") (collectively, "Defendants"), and respectfully shows the Court as follows:

**Introduction**

1.      Shintech bargained with Defendants in 2016-2017 for a ▮▮▮ supply contract ("VCM Contract") commencing ▮▮▮▮ for Defendants' vinyl chloride monomer ("VCM") that is vital to Shintech's Freeport, Texas plant where Shintech produces polyvinyl chloride ("PVC"). Notwithstanding that Shintech has timely paid Defendant Blue Cube over ▮▮▮▮▮ since the VCM Contract commenced, and contract provisions specifically designed to avoid unplanned supply disruptions for the critically needed VCM, Defendants have refused and failed to deliver the required VCM for reasons not permitted by the VCM Contract. Defendants'

unjustifiable cessation of supply is part of Defendants' big picture business model.  In this instance, Olin is using its wholly owned subsidiary, Defendant Blue Cube, to help execute Olin's business model.

2.    More specifically, under the leadership of Scott Sutton and Patrick Schumacher, Defendants recently developed and executed a consistent business model: withdraw supply in an attempt to unilaterally impose price increases, even if that is contrary to Defendants' existing long term supply contracts. Defendants are well aware that, for many customers, there is no alternative but to pay the extra-contractual price demanded. Defendants' awareness stems from knowledge that its customers must have the supply or suffer significant harm.  In other words, Defendants' customers have no choice but to capitulate – even where long term contracts are in place.

3.    Defendants are not shy about this, with leadership touting that: "Olin people are masters of the ECU.[1] That means we don't sell excessive volumes into poor quality markets.  Instead, *we withdraw supply*, and we generate purposeful activations on both sides of the ECU, up and down our derivative chains, resulting in margin improvements on both sides of the ECU."

4.    Mr. Sutton and Mr. Schumacher have also stated Defendants' intention to "open up" long-term or "legacy" contracts. During Olin's November 5, 2020 earnings call, Olin bragged that its "building phase" was complete and that it was inaugurating its "leading phase" to exploit its "#1 position in every product and geography." By July 28,

---

[1] ECU stands for Electrochemical Unit, a unit of measure reflecting chlor-alkali process outputs.

2021, Sutton declared his "strategy is to move Olin's pricing up as we run our model . . . I mean we're taking very specific actions and trying to telegraph those actions in advance so that the world understands that this is a purposeful activity."

5.      In the same earnings call, Sutton explained the company's new approach to pricing the company's "linchpin" products: "Our pricing in those products is a ratchet. ***Our pricing only turns one way and does not reverse***. ***If necessary, we will sell zero volume*** into the freely negotiated market to preserve our ratchet principle and the value of our broad downstream chains based on those linchpin products."

6.      Recently, the very tactics outlined by its own executives in various earnings calls have landed Olin in federal courts across the country. Apparently, Olin is "opening up" long-term supply contracts for chlorine,[2] caustic soda,[3] bleach,[4] and in the present case, VCM.

7.      Accordingly, Shintech brings this action seeking permanent injunctive relief to halt the irreparable harm Defendants' actions threaten and have caused, as well as damages caused by the harm already inflicted.

---

[2] *Albermarle Corporation v. Olin Corporation*, Case No. 1:23-cv-00600-CMH-WEF (E.D.V.A. 2023) (chlorine)

[3] *Innovative Water Care, LLC v. Olin Corporation*, Case No. 1:22-cv-00070-DCLC-CHS, (E.D. Tenn. 2022) (caustic soda).

[4] *Odyssey Manufacturing v. Olin Corporation*, Case No. 8:23-cv-00940-TPB-CPT (M.D. Fla. 2023) (bleach). On June 28, 2023, the District Court for the Middle District of Florida held a hearing on Odyssey Manufacturing's motion for preliminary injunction. Later that day, the Court issued an order via docket entry, stating that Odyssey had established a likelihood of success on its claim that Olin breached the contract between the parties. *See id.* at Dkt. 41.

**Parties**

8.     Plaintiff Shintech is a corporation organized and operating under the laws of the State of Delaware.  Shintech's principal place of business is located at 3 Greenway Plz #1150, Houston, Texas 77046.

9.     Defendant Olin is a corporation organized and operating under the laws of the State of Virginia. Olin's principal place of business is located at 190 Carondelet Plaza Suite 1530, Clayton, Missouri 63105.

10.     Defendant Blue Cube is a limited liability company organized and operating under the laws of the State of Delaware. Blue Cube's principal place of business is located in Freeport, Texas. Upon information and belief, the sole member of Defendant Blue Cube Operations LLC is Blue Cube Holding LLC, and the sole member of Blue Cube Holding LLC is Blue Cube Spinco LLC. The sole member of Blue Cube Spinco LLC is Defendant Olin Corporation.

**Jurisdiction and Venue**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.   There is complete diversity of citizenship between the parties, as Defendants are citizens of Missouri and Virginia, and Plaintiff is a citizen of Delaware and Texas. The amount in controversy exceeds $75,000.00.

12.     This Court has, at a minimum, specific personal jurisdiction over Defendants because their conduct at issue in this action occurred in the State of Texas and Plaintiff's claims herein arise from that conduct. The facts and legal arguments set out in detail by Shintech in its Response to Olin's Motion to Dismiss (Dkt. 19), which are incorporated

herein by reference in its entirety for any and all purposes, establish that this Court has personal jurisdiction over Defendants in this lawsuit. On May 8, 2023, the Court agreed with Shintech, concluding that Defendant Olin is subject to personal jurisdiction in this Judicial District for the conduct at issue in this case, and denied Olin's Motion to Dismiss for Lack of Jurisdiction (Dkt. 34).

13.    Venue is proper in this Court because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Galveston Division of the Southern District of Texas.  28 U.S.C. § 1391(b)(2). Venue is also proper in this Court because Defendants are subject to this Court's personal jurisdiction with respect to this civil action, and thus Defendants' "reside" in the Galveston Division of the Southern District of Texas for venue purposes. *Id*. § 1391(b)(1).

## Factual Background

### A.    The Chlor-Alkali, VCM, and PVC Markets

14.    Shintech is the largest producer of PVC resin in the United States.  PVC resin is generally produced in powder form and sold to customers.  Upon information and belief, while PVC resin can be *sold* by itself, it cannot be *used* alone and must be further processed by adding ingredients to achieve desired properties, such as flexibility, impact resistance, UV stability, flame resistance, and color. Examples of the types of ingredients added to the

PVC resin include various plasticizers[5], stabilizers, lubricants[6], impact modifiers[7], and other additives.[8]  As the ingredients are added, they are heated and cooled.  This process is known as "compounding" and the resulting material is referred to as a "PVC compound," which is sold to make various other products such as PVC pipe, vinyl siding, window profiles, fencing, film wrap, medical devices, and many other products.

15.     VCM is produced through what is known as the "chlor-alkali process," by which a salt-water solution is separated into caustic soda (sodium hydroxide) and chlorine. Chlorine is then combined with ethylene to produce ethylene dichloride ("EDC").  EDC is then "cracked" through heating in a furnace, producing VCM. VCM is highly volatile, toxic, and flammable. It is transported via railcar, barge, or pipeline.

16.     Substantially all VCM produced is used to produce PVC, and substantially all PVC resin is produced by polymerizing VCM. Approximately one pound of VCM is required to produce a pound of PVC resin. Thus, a reliable supply of VCM is essential to the business of PVC resin producers, and PVC resin production is essentially the only use for VCM.

---

[5] A plasticizer is a substance added to the PVC resin that promotes flexibility and inhibits brittleness. https://www.teknorapex.com/from-pvc-resin-to-vinyl-compound#:~:text=PVC%20compound%20is%20rigid%20at,more%20flexible%20the%20PVC%20becomes.

[6] Lubricants are added to help with melt viscosity, compound flow, and to minimize both processing and molecular friction.  *Id.*

[7] Impact modifiers are used to improve impact resistance.  Examples are acrylics, polystyrenes, and urethanes. https://additives-pvc.com/pvc-impact-modifier/.

[8] Other additives may be introduced to enhance or create unique properties within the type of PVC compound being produced.  https://www.teknorapex.com/from-pvc-resin-to-vinyl-compound#:~:text=PVC%20compound%20is%20rigid%20at,more%20flexible%20the%20PVC%20becomes.

17.    Upon information and belief, the vast majority of VCM produced in the United States is consumed internally by PVC resin producers. In other words, other producers of VCM do so for their internal PVC resin production.  Upon information and belief, Defendants are the only U.S. producers of VCM without a downstream PVC resin operation. Reportedly, however, Olin is currently seeking to partner with a PVC resin producer to whom Defendants can produce and sell VCM, whether through a partnership, joint venture, or otherwise.  Additionally, upon information and belief, in January 2023, Blue Water Alliance JV, LLP—a joint venture between Olin and Mitsui & Co., Ltd., received all necessary approvals to begin operations of globally trading caustic soda and EDC (the latter, again, is the chemical that ultimately converts to VCM).

**B.    The Freeport, Texas Plant Olin and Blue Cube Currently Operate Has Supplied VCM to Shintech for Decades.**

18.    Since 1974, Shintech operated a PVC resin plant in Freeport, Texas. Historically, Shintech purchased VCM produced at Dow Chemical's petrochemical complex adjacent to Shintech's Freeport PVC plant. Upon information and belief, Dow produced VCM but did not produce PVC resin. Shintech and Dow had a succession of long-term contracts, typically with ten-year terms.  Dow delivered this VCM via a 1.3-mile pipeline connecting its VCM plant to Shintech's PVC resin plant.

19.    About 50% of Shintech's supply of VCM for its Freeport PVC plant comes via the short pipeline to the Dow VCM plant.[9]  The other approximately 50% of the VCM for Shintech's Freeport, Texas plant is supplied by Shintech's VCM plants in Louisiana.

---

[9] The other 50% of the VCM for Shintech's Freeport, Texas plant has been supplied by Shintech's VCM plants in Louisiana.

Before VCM production occurred in Louisiana, upon information and belief Shintech effectively obtained 100% of its VCM requirements from the Dow VCM plant.

20.    The Shintech PVC plant and the Dow VCM plant even underwent several coordinated expansions over the years, as Dow needed Shintech as a customer for its VCM, and Shintech needed Dow's VCM to fully utilize its PVC plant. The Shintech Freeport PVC plant and the Dow Freeport VCM plant had a symbiotic relationship that benefitted both companies.

21.    Shintech and Dow negotiated a contract effective from 2010 to 2020 for the purchase and sale of VCM from Dow's Freeport plant.  Because of the long-term nature of that contract and the fact that the companies' plants were mutually dependent, the price Shintech agreed to pay for Dow's VCM fluctuated depending factors to include certain costs Dow would incur in producing VCM, revenues Dow would earn on the sale of caustic soda (a co-product with the production of chlorine Dow used to produce VCM), and the price Shintech received for sales of PVC resin.

22.    Upon information and belief, in 2015, Dow and Olin announced plans to "merge" their respective chlor-alkali and vinyl chlorinated organics and global epoxy businesses, which included Dow's caustic, EDC, and VCM plants at Freeport, in a transaction in which Dow's shareholders would acquire a majority stake in Olin.

23.    Upon information and belief, Dow formed and originally owned Blue Cube Operations LLC, into which it transferred its chlor-alkali, EDC, and VCM operations at Freeport, Texas.  In Dow's transaction with Olin, Olin acquired Blue Cube.

24.    The contract between Dow and Shintech remained in effect after Dow transferred Blue Cube to Olin, and Dow continued to supply VCM under that contract to Shintech from the now-Blue Cube Freeport plant.

25.    Upon information and belief, many of the management employees of Dow and Blue Cube responsible for the VCM business continued under the ownership of Blue Cube and Olin, even after Olin acquired Blue Cube from Dow.

26.    Olin knew about the VCM supply contract between Shintech and Dow when it acquired the Freeport plants from Dow.

27.    The most economical and safest means of transporting VCM to Shintech's Freeport plant by far is via the short pipeline to the neighboring VCM plant of Dow acquired by Olin. Consequently, it would be virtually impossible to use another VCM supplier to provide VCM to Shintech's Freeport PVC plant.

28.    The Shintech Freeport PVC plant and the Dow Freeport VCM plant acquired by Olin are next-door neighbors:



29.    Substantially all VCM produced is used to produce PVC resin, and Defendants do not currently produce PVC resin,[10] so Shintech's proximate plant was a desirable customer.

30.    Accordingly, both Shintech and Defendants viewed it desirable to put a ███ ██████████ in place many years before the Shintech/Dow contract expired.

### C.    The VCM Contract

31.    Following the announcement in 2015 that Dow was merging its Gulf Coast chlor-alkali assets with Olin, Shintech and Olin began negotiating a new supply contract in 2016 (*i.e.,* the VCM Contract) to continue the supply, purchase, and sale of VCM to Shintech following expiration of Shintech's contract with Dow at the end of 2020. Specifically, in August 2016, Olin and Shintech began negotiating a new contract to meet Shintech's long term VCM needs starting in ██████████—upon the expiration of the Dow/Shintech contract in 2020.  Negotiations for the VCM Contract started over ████████ in advance of when VCM would be delivered under it because, if a deal could not be struck, both companies would have to make serious alterations in their plans for their respective plants.

32.    On August 5, 2016, Olin's VP/President Damien Gumpel sent a draft contract to Shintech titled "Olin Proposal_Aug 5 2016."  This draft contract made no direct reference to Blue Cube (a company already in existence); the parties were Shintech and Olin.

---

[10] Upon information and belief, Olin is currently seeking a partnership with a PVC producer to whom Defendants can produce and sell VCM.

33.    On November 9, 2016, Mr. Gumpel wrote that "Olin is pleased to provide [Shintech] with [a] letter of intent with respect to our mutual interest in pursuing long-term supply of [VCM]."  Again, Olin failed to reference Blue Cube, and the negotiations continued to discuss a contract between Olin and Shintech.

34.    In January and February of 2017, Olin and Shintech continued negotiations. When Olin finally made clear that its wholly-owned subsidiary, Defendant Blue Cube, would be the "invoicing party," Shintech requested Olin guarantee performance of the terms Shintech and Olin had been negotiating for months.  Olin first confirmed it was open to a parent guarantee, and then - after performance guarantee language was incorporated into the VCM Contract as an attachment - Olin confirmed the language was clear that Olin was responsible for the performance of Blue Cube.

35.    The VCM Contract was signed late February 2017, with VCM being "delivered via the existing pipelines connecting Seller's VCM plant to Customer's PVC plants in Freeport, Texas." Exhibit 1. Olin guaranteed Blue Cube's performance under the VCM Contract. *Id.* at Attachment G, p. 22. The VCM Contract commenced on ████████ ████, and remains effective through ████████████████ (the "Term").

36.    As was the case with the Shintech contract with Dow, the new VCM Contract contemplated very large supplies of VCM to Shintech and very large payments by Shintech. VCM is delivered to Shintech via the pipeline connecting the parties' respective plants often exceeding ████████ pounds per day. The VCM Contract also contains a detailed pricing mechanism for determining the price of VCM. Exhibit 1 at Attachment C, p. 11.  Components of the VCM price include (without limitation) ████████████████

11

███████████████████████████████████████, as

well Blue Cube's ███████████████████████████████████████

███████████████. Nothing in the VCM Contract contemplates the profits, revenues, or

costs associated with selling PVC compounds or other products made from PVC (sewer

pipe, decking, siding, etc.) are components of determining the price of VCM.

37.    More specifically, at the end of each month, Blue Cube initially invoices

Shintech at an estimated price for the VCM it sold. ████████████████, the parties then

must provide each other various inputs for calculating price: As defined by the contract,

Shintech provides a "PVC Net Back" input for the PVC resin it produces, while Blue

Cube provides Shintech a "Caustic Net Back" input for the caustic soda produced. *Id.*

at 9, 13–16. These inputs are used to further calculate the VCM price, which is trued up

████████████████████████████. Based on these calculations, Blue Cube must

then "issue the appropriate debit or credit" to Shintech within ████████████ days.

Exhibit 1 at Attachment B. Again, Olin guaranteed Blue Cube's performance under the

VCM Contract.

38.    If either party disputes the accuracy of a PVC Net Back or a Caustic Net

Back, the disputing party has a "right to request and receive a statement of audit" performed

by the other party's independent public accountant. The audit must be requested by April

30 of each year, for the preceding year.

39.    In 2021 and 2022, the first two years under the VCM Contract, Shintech

purchased over ██████████████ of VCM each year, at a price of about ████████████ each

year. ████████████████████████████████████████████

████████████████████████████████████████.

40.    Shintech ████████████████████████ and nominated ███████

██████ pounds of VCM for delivery in 2023.  As its "Sellers Commitment," Blue Cube

agreed to supply ███████████ pounds in 2023, which, pursuant to the VCM Contract,

constitutes the parties' respective purchase and supply obligations for 2023.  Again, Olin

guaranteed Blue Cube's performance under the VCM Contract, which included the

obligation to supply VCM to Shintech

41.    For the last 2+ years, Shintech's dealings under the VCM Contract have

largely been with employees of Olin, some of whom also upon information and belief also

are employees of Blue Cube.  When Shintech has communicated about the VCM Contract

with Blue Cube and even Olin, almost all such dealings with Defendants have been, when

in writing, from olin.com domain emails coupled with Olin's logo.  In those situations,

those olin.com domain emails still appear to also speak on behalf of Blue Cube, while

arguably on behalf of Olin too.

42.    Because of the importance of the operations of Shintech's plant to Blue

Cube's plant, and vice versa, Shintech and Defendants were both well-aware of the severe

consequences any disruption of Shintech's VCM purchases or Defendants' VCM supply

could have to one another. For example, if Shintech were to suddenly cease purchasing

VCM, Defendants may have difficulty quickly finding another outlet for such a large

percentage of their VCM production at Freeport.  Likewise, if Defendants were to suddenly

cease delivering VCM to Shintech's Freeport plant, Shintech would have grave difficulty

in acquiring VCM to replace the magnitude of Defendants' supply. The VCM Contract contains many provisions to avoid and minimize such disruptions.

43.     First, the VCM Contract provides for significant lead times for the determination of the volume of VCM to be delivered and purchased.   Under the VCM Contract, Shintech must notify Blue Cube by June 30 of the preceding year of the VCM volumes Shintech wants to buy for the upcoming year. From 2021 to 2023, Shintech had to nominate at least ██████████ pounds of VCM annually. After receiving Shintech's nomination, Blue Cube has until August 31 to tell Shintech the volume it would supply. Blue Cube agreed to provide at least ████████ pounds of VCM each year during that time (and no more than the amount Shintech requested).

44.     Second, as noted, Shintech is required to pay e████████████████████ ████████████████████████████████████████████. Shintech ████████ ████████ and nominated ████████████ pounds of VCM for delivery in 2023.  Blue Cube agreed, as its "Sellers Commitment" to supply ████ billion pounds in 2023.  Again, Olin guaranteed Blue Cube's performance under the VCM Contract, including this supply commitment.

45.     Third, the VCM Contract contains specific provisions for the resolution of any disputes that would arise over the calculation of PVC Net Back and Caustic Net Back. Defendants calculate the Caustic Net Back, upon information and belief on their sale of caustic soda.  Shintech calculates the PVC Net Back based on sales of PVC resin.  Both companies sell caustic soda, and both produce VCM.  And again, industry publications indicate that as of 2022, Olin was seeking a partnership with a PVC producer (not Shintech)

14

because it was the only U.S. producer of chlor-alkali without a downstream PVC operation. Thus, both sets of information (the Caustic Net Back calculation and PVC Net Back calculation) contain highly confidential competitive information of the respective companies. The VCM Contract's audit provision provides that whether the PVC Netback or Caustic Netback was accurately and consistently determined in accordance with generally accepted accounting principles was to be determined by an independent public accountant who would provide a statement to that effect. *See* Exhibit 1 at Attachment E.

46.    Fourth, the VCM Contract contains a detailed dispute resolution procedure. Exhibit 1, Attachment F. Under the dispute resolution procedure, the parties' senior executives are required to meet in an effort to resolve any and all disputes that arise. *See id.* However, the VCM Contract's dispute resolution procedure expressly states that "either party may apply to a court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim conservatory relief, as necessary to enforce the provisions of this Contract." *Id.* Additionally, the VCM Contract specifically allows each party the remedy of specific performance. *Id.* at p. 6.

47.    Fifth, the VCM Contract anticipates that approximately every three years Blue Cube would conduct a "Major Turnaround" on its VCM facility that would substantially reduce, if not eliminate entirely, VCM deliveries to Shintech during the Major Turnaround. The VCM Contract specifically provides that a "Major Turnaround will not last more than ▮▮▮▮▮▮▮ in duration." Exhibit 1, A(5), pp. 1-2

48.    The VCM Contract's execution and its nomination, ▮▮▮▮▮▮▮▮, audit, dispute resolution, specific performance, and Major Turnaround provisions were

15

agreed to by the parties in part specifically to avoid disruptions in the supply of VCM by Blue Cube and the payment for VCM by Shintech that were vital to both companies.

**D.    Defendants Demand a Price Increase and Refuse to Supply VCM Following Completion of the Major Turnaround.**

49.    In late January 2023, Shintech requested a $2.4 million credit note for the ████████████████████ under the VCM Contract.  Neither Blue Cube nor Olin has paid this credit.  Shintech had previously requested, and received, a similar credit note for the ████████████████████ under the VCM Contract.  Yet on March 13, 2023, Olin's Vice President and President, Chlor Alkali Products and Vinyls, Patrick Schumacher, wrote Shintech and disputed Shintech's request for a ███████████████ credit. Upon information and belief and in light of Mr. Schumacher's conduct throughout this dispute, Mr. Schumacher appears to have authority to act on behalf of both Olin and Blue Cube.  Mr. Schumacher claimed to have "backtested pricing to the start of 2021" for Shintech's PVC Net Back values and found they resulted in a shortfall to Olin for the period December 2022 through February 2023. Schumacher also asserted that "we have gone back to check on the caustic soda netback imbedded in the VCM price and found it to be too high," such that Defendants had made errors.  Mr. Schumacher claimed "we have given Shintech credit for at least $5mm" for the years 2021 and 2022 which "must be reversed."

50.    In the email, Schumacher asserted that in total "Olin has been shortchanged" millions of dollars (including for Defendants' own alleged errors calculating the Caustic Netback), and - consistent with Olin's new business model of withholding supply – that "we will not provide product following our turnaround unless these matters have been fully

resolved. Consider any existing volume nominations cancelled."[11] Mr. Schumacher also repudiated the dispute resolution procedure, stating "*we will **NOT** be following the contract resolution mechanism*, which contemplated the resolution of smaller day to day disagreements between cooperative parties."

51.     On March 17, 2023, Shintech responded to Schumacher's March 13 email, providing notification that Shintech categorically rejected the unilateral attempt "to cancel the existing nomination and threat to suspend deliveries following the [Major] [T]urnaround" based on Schumacher's allegations of the incorrect calculation of the PVC Netback and Caustic Netback and of Shintech's allegedly improper credit note request for the ███████████████████. Shintech stated such actions were not allowed under, *and were an anticipatory breach of*, the VCM Contract.  In this response to the substance of Schumacher's March 13 email, Shintech invoked the Dispute Resolution Procedure.

52.     Olin's Senior Counsel Dustin Manning, Olin VP/President Schumacher, and General Counsel Chemicals Matthew Martin acknowledged Olin's and Blue Cube's receipt of Shintech's notification on March 21, 2023. Mr. Manning "reiterate[d] the points" from Schumacher's March 13 email, *i.e.,* that Olin would "suspend performance under the [VCM] Contract until" the parties' pricing and accounting disputes were resolved.  *Id.* Upon information and belief and in light of Mr. Manning's conduct throughout this dispute, Mr. Manning appears to have authority to act on behalf of both Olin and Blue Cube.

---

[11] The "turnaround" referenced was Defendants' ongoing "Major Turnaround" allowed once every three years under the VCM Contract.  Planning for this 2023 Major Turnaround began no later than August 2022.  Blue Cube's 2023 Major Turnaround began ██████████████████.  Per the parties' agreement and specifically Shintech's accommodation to extend the Major Turnaround to a period of ████████, the Major Turnaround was required to end by ███████████.

53.     Shintech wrote back on March 31, 2023 and emphasized that the VCM Contract's Dispute Resolution Procedure (set forth at Attachment F thereto) was the proper and contractually required way to address the parties' difference of opinion.  Shintech again "demand[ed] that [Schumacher] retract [his] threats and confirm in writing, by no later than April 5, 2023, that [Defendants] will resume deliveries of product immediately following completion of" the Major Turnaround.

54.     On April 6, 2023, Defendants identified three Olin representatives (Schumacher; Olin's Business Director Pedro Dias Jorge; and Olin's Business Director Soo Tan) who would "attend the meeting on behalf of Olin."  Mr. Manning failed to retract Mr. Schumacher's repudiation of the VCM Contract.

55.     With Defendants' breach for unjustifiably withholding supply only ■ days away, Shintech filed this lawsuit seeking specific performance and injunctive relief on April 13, 2023, as allowed by the dispute resolution procedure. *See* Exhibit 1 at Attachment F. That same day, Shintech wrote Defendants advising them of the lawsuit and Shintech's intention to seek preliminary injunctive relief. Shintech also nominated Toshiaki Ansai, Shintech's Vice President, David Tidholm, Shintech's Vice President, and General Counsel, and Yoshiaki Tamaru, Shintech's Plant Controller, to attend the dispute resolution meeting.  The parties eventually agreed to meet May 12, 2023.  Schumacher himself "confirm[ed] the meeting for May 12," stating "we can be available at 9:00am" and offering "our Houston offices" as the meeting place.

E.    **Defendants Unjustifiably and Strategically Extends the Major Turnaround to Gain Leverage over Shintech.**

56.    The VCM Contract provides that a "Major Turnaround will not last more than ████████ in duration." In October 2022, Defendants recognized this and requested an extension to ████ days. Shintech accommodated this request. The Major Turnaround was thus set to end no later than ████████, requiring VCM supply to resume ████ ██.

57.    On March 13, 2023, the same day Schumacher sent the email described above cancelling all existing nominations of VCM, Defendants represented that the Major Turnaround was progressing according to schedule. This representation was false. Defendants had previously internally determined they would not complete the Major Turnaround by ████████. Again, on March 22, 2023, Defendants represented to Shintech that the Major Turnaround was on schedule. This representation was also false. Starting March 29, 2023, Defendants refused to provide any further updates on the completion of its Major Turnaround.

58.    On April 17, 2023, after Shintech filed this lawsuit seeking injunctive relief, Olin's Senior Counsel Dustin Manning acknowledged Defendants' receipt of Shintech's April 13 letter and advised that the Turnaround at "Olin's VCM Plant" was "currently not expected to be complete until ████████ at the earliest." When supply did not resume ████████, Shintech provided yet another written notification of default that same day and demanded an immediate cure.

59.     After Shintech filed this lawsuit, Defendants purposefully delayed the completion of the Major Turnaround. As of ███████████, Defendants were approximately ███ complete with the Major Turnaround and, upon information and belief, could have completed the Major Turnaround by ██████████ at the latest. But Defendants did not want to exceed their budget by around 2% to complete the Major Turnaround by that date. To illustrate, if the budget for the Major Turnaround was $1,000,000, Defendants could have spent an extra $20,000 to complete by █████; if the budget for the Major Turnaround was $100,000,000, Defendants could have spent an extra $2 million to complete by █████. The overall message delivered to Defendants' personnel carrying out the Major Turnaround was to keep costs down, which was a decision in Defendants' reasonable control.

### F.    Injunction Hearing and Dispute Resolution

60.     On Wednesday, May 10, 2023, the Court held a hearing on Shintech's Motion for Preliminary Injunction. During the Hearing, the Court noted that based on the briefing, Shintech satisfied three of the four elements necessary for a preliminary injunction, *i.e.,* substantial likelihood of success on the merits, balance of the equities, and public interest. The fourth element—irreparable harm—was a "really close call."

61.     Two days later, on Friday, May 12, the parties met at Shintech's office in Houston, Texas. Shintech sent its three representatives designated under the Dispute Resolution Procedure. However, contrary to the April 6 representation from Olin's Senior Counsel Dustin Manning of who would appear, neither Patrick Schumacher nor Soo Tan (two of Olin's three nominated executives) attended. Instead, Defendants sent Pedro Dias

Jorge and one of Defendants' outside counsel representing both Defendants in this litigation to Shintech's office. Defendants gave no notice to Shintech's outside counsel in this litigation that Defendants' outside counsel was going to attend.

62.     On May 18, 2023 the Court issued a Memorandum Opinion and Order denying Shintech's Motion for Preliminary Injunction. The Court noted that irreparable harm was not shown because, "[p]resumably, Shintech could avoid all the harms it identifies by paying Blue Cube the amount in dispute." Dkt. 54 at 21. The Court further noted that if Shintech prevailed at trial, this "overpayment would be recoverable as damages with interest" in the lawsuit. *Id.*

63.     Accordingly, on May 22, 2023, Shintech stated that if VCM supply resumed, Shintech would pay $18,000,000 under protest within 48 hours. Mr. Schumacher responded, making clear that his March 13, 2023 repudiation was not conditional by stating that "VCM supply will not be resuming." After Shintech's Vice President, Toshiaki Ansai, pressed for a further explanation, Mr. Schumacher stated:

> My original email didn't say you could pay under protest—now you are attempting to misreport the history which is clear in the email. It only said we were owed that money and would run when you righted the wrong. This amount has since become closer to $30mm by the way as we've collected more data and continued to suffer additional months of bad PVC pricing.

64.     Then, about four hours later, Schumacher followed up with a laundry list of reasons why VCM supply would not be resuming, including that Shintech should first pay the [disputed] $18 million and *then* seek resumed VCM supply. Shintech promptly responded that it would pay the $18 million under protest if VCM supply would resume and be maintained within 24 hours of receiving payment.

65.     During these communications Mr. Ansai stated multiple times that Shintech was not making an offer to settle the case but was instead making a business decision allowing for the resume of VCM supply as quickly as possible to stop the harm to Shintech.

66.     Later during the evening of May 23, 2023, the parties were informed they were ordered to mediate and promptly began making arrangements to mediate with Magistrate Judge Edison on June 8, 2023.

67.     The next morning, on May 24, 2023, Mr. Schumacher changed course and promised to resume VCM supply within 24 hours of receiving $18 million from Shintech, acknowledging that such payment would be made under protest.  Almost immediately, Shintech wired $18 million, and Mr. Schumacher confirmed receipt.

68.     Later in the evening on May 24, 2023, the parties were informed they would not be mediating on June 8, 2023 before Magistrate Judge Edison, and the June 8 mediation was cancelled.

69.     The following morning, May 25, 2023, Mr. Schumacher emailed Mr. Ansai and noted a "major issue in the plant restart" due to "moisture from a quench tank that's never seen moisture [getting] into one of the distillation columns." According to Mr. Schumacher, the VCM plant would now not be operational for an additional 10-14 days.

70.     The dispute resolution period for this dispute ended on May 31, 2023.

71.     On Friday, June 16, 2023 Defendants advised that they would be able to supply about ███████ pounds of VCM per day, less the half of the required daily supply under the VCM Contract. Accordingly, this reduced supply resumed on June 17, 2023.  In fact, on June 16, 2023, Mr. Schumacher sent a letter to Shintech asserting that "unforeseen"

and "unplanned equipment failures beyond our reasonable control" excused Blue Cube's performance retroactively to May 25, 2023 – which was the day following Shintech's payment of $18 million under protest in return for Mr. Schumacher's promise to resume product flow within 24 hours of receiving funds from Shintech.

72.    VCM supply resumed at reduced rates until around July 12, 2023, when Mr. Schumacher abruptly wrote Shintech stating that VCM production was stopping again for approximately 3 weeks, citing back to his June 16 letter about alleged equipment failures. Mr. Schumacher refused Shintech's request to have Defendants' team of engineers contact Shintech's operations people to explain what was happening, give an estimated time for reapris, works, ramp-up, and normal rates.

**G.    The Refusal to Supply VCM and Partial Supply of VCM Have Harmed Shintech.**

73.    Defendants' refusal and failure to supply VCM has caused Shintech certain irreparable harm and monetary damages.    Again, Olin guaranteed Blue Cube's performance under the VCM Contract.

74.    Upon information and belief, Defendants are the only producer of VCM in the United States without a downstream PVC operation and all other U.S. producers of VCM do so for purposes of their own PVC production.

75.    Shintech has so far been unable to secure alternative sources of supply. As an example, one of Shintech's main PVC competitors, Westlake Chemical Corporation ("Westlake"), recently reached out to ask if ***Shintech*** had any VCM to sell. As recently as June 26, 2023, Shintech reached out to Westlake and other of Shintech's competitors, such

as Occidental Petroleum Corp. ("Oxy") and Formosa Plastics Corporation ("Formosa"), inquiring about available quantities of VCM for Shintech to purchase to make up for the shortfall caused by Defendants. Neither had any available volume of VCM to sell to Shintech. Since then, other PVC resin suppliers have contacted at least one Shintech customer, proposing to supply PVC resin and noting that Defendants' failure/refusal to supply VCM resulted in Shintech cutting export sales and delaying domestic shipments.

76.    VCM may only be delivered to Shintech's Freeport PVC plant by either the pipeline from Blue Cube's VCM plant or by specialized rail cars. Because of the limited availability of VCM qualified rail cars, and the constraints of the rail connections and unloading facilities, even if Shintech could acquire other supplies of VCM (including from Shintech in Louisiana), it would be unable to get more than a small fraction of the ▓▓▓▓▓▓▓ pounds a day it should be receiving under the VCM Contract. In short, buying and moving sufficient volumes of VCM from alternative sources to cover the supply shortfall caused by Defendants is not realistically possible.

77.    Relatedly, Shintech's Louisiana VCM production (which supplies 50% of the VCM needed to produce PVC resin at its Freeport, Texas plan) is already producing at full capacity, so Shintech cannot simply ramp up capacity to meet the shortfall. Further, Shintech's Freeport plant does not have port access. It cannot import VCM from overseas.

78.    It takes approximately one pound of VCM to produce one pound of PVC resin. Accordingly, the shortfall in VCM caused by Defendants' breach of the VCM Contract and Olin's refusal/failure to guaranty Blue Cube's performance has caused and

24

will cause Shintech's PVC production to decrease by approximately the same number of pounds for which there is a shortfall in VCM.

79.    Not only is Shintech losing sales revenue because of Defendants' conduct, but it is in danger of harm to its reputation and goodwill. Shintech prides itself as being a company on which its customers can rely to provide quality products on a timely basis. Defendants' conduct is putting that reputation at risk. Recently, Shintech has received anxious messages from customers regarding Shintech's ability to fill future orders for PVC resin. These inquires started no later than May 10, 2023—the same day as the hearing on Shintech's Motion for Preliminary Injunction.  This month Shintech learned that other PVC resin producers are attempting to leverage Defendants' breaches into longer-term supply arrangements with Shintech's customers.

80.    Shintech is presently operating its Freeport PVC plant at reduced capacity simply because of Defendants' breaches.  The consequences of this extend beyond Shintech itself.  As PVC resin production decreases, impacts include reducing headcount, closing facilities where PVC resin is bagged, and partially shutting down production lines—all of which impact Shintech operators, engineers, and other employees.

81.    Defendants' wrongful refusal to deliver VCM has resulted, and if not brought back to full volume, will continue to result, in Shintech losing revenues and profits on PVC resin sales, and as Defendants were undoubtedly aware at the time the VCM Contract was executed, those lost revenues and profits are the natural and necessary result of Defendants' failure to supply VCM, given that the price of VCM is directly dependent ██████████ ████████████████.

**Claims for Relief**

**Count One**
**Declaratory Judgment**

82.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

83.    There exists between the parties a dispute as to (i) whether Defendants' may legitimately withhold or refuse or fail to supply VCM to Shintech under the VCM Contract based on a pricing dispute; (ii) whether the VCM Contract permits a unilateral extension of the Major Turnaround; (iii) whether "PVC" as used in the VCM Contract means PVC resin, the product Shintech makes from the VCM supplied under the VCM Contract, or also includes PVC compounds made from a combination of PVC and other materials/ingredients, or also includes end products manufactured from, among other materials/ingredients, compounds containing PVC resin as only one of the ingredients; (iv) whether Shintech's lost revenues and lost profits caused by Defendants' wrongful withholding of and failure to supply VCM fall within the consequential damages waiver set forth in the VCM Contract, given that the price of VCM is directly dependent on the ███████████████████████; (v) whether the Performance Guarantee obligates Olin to perform Blue Cube's VCM supply obligations under the VCM Contract; namely to ensure a continuous supply of VCM; (vi) whether Section 7(d) of the VCM Contract applies to a failure and/or refusal to supply VCM, as opposed to a situation where the VCM supplied does not comply with the contractual quality requirements; and (vii) whether Defendants' actions respecting the Major Turnaround, as well as allegations contained in and after the

26

June 16, 2023 letter about "equipment failures beyond our reasonable control" were made in good faith or otherwise excuse performance.

84.     Shintech requests that the Court declare: (i) Defendants cannot withhold supply under the VCM Contract based on a good-faith pricing dispute; (ii) Defendants are contractually obligated to continue supplying VCM to Shintech in accordance with the VCM Contract and the Performance Guarantee for the remainder of the Term; (iii) "PVC" as used in the VCM Contract means PVC resin only; (iv) Shintech's lost revenues and lost profits are direct damages and do not fall within the consequential damages waiver set forth in the VCM Contract; (v) the Performance Guarantee obligates Olin to perform Blue Cube's VCM supply obligations under the VCM Contract in the event of Blue Cube's default; (vi) that Section 7(d) does not apply to Defendants' failure and/or refusal to supply VCM to Shintech; and (vii) Defendants' actions respecting the Major Turnaround and following the Major Turnaround were not in good faith and/or performance is not excused.

### Count Two
### Breach of Contract Against Blue Cube

85.     Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

86.     Blue Cube has committed numerous material breaches of the VCM Contract, entitling Shintech to injunctive relief and damages as set forth below.

### A.     Withholding of VCM Supply Based on a Good Faith Pricing Dispute

87.     Blue Cube is obligated to supply VCM to Shintech, as provided by the VCM Contract.

88. Under the VCM Contract's plain and unambiguous terms, nothing permits Blue Cube to withhold VCM based on a good faith pricing dispute for amounts that have never been invoiced.

89. Despite this, Blue Cube materially breached the VCM Contract when Mr. Schumacher repudiated its obligations under the VCM Contract and in refusing to supply VCM based on a good faith pricing dispute involving unsupported allegations that Shintech had incorrectly calculated the PVC Net Back and that Defendants had incorrectly calculated the Caustic Net Back.

90. Although Blue Cube (through Mr. Schumacher) promised to resume VCM supply in exchange for Shintech paying $18,000,000 under protest, and to resume supply within 24 hours of receiving such payment, VCM supply did not resume until June 17, 2023, despite Shintech's payment under protest of the $18,000,000, and the supply of VCM is was only at about 50% of the daily rates through July 12, when Mr. Schumacher again stopped supply.

91. Blue Cube's refusal or failure to fully supply VCM has irreparably harmed Shintech, and Shintech will suffer further certain irreparable harm if this conduct is not enjoined.

92. In the alternative, Blue Cube's refusal or failure to fully supply VCM has caused, and will continue to cause Shintech monetary damages. Due to the way VCM is priced under Attachment C to the VCM Contract, Blue Cube knew that a failure to supply VCM to Shintech would naturally and necessarily cause lost profits on PVC resin sales,

because the VCM price is directly dependent on ████████████████████████
██████.

93.     Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*,
Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys'
fees and costs.

### B.     Failure to Provide End-of-Year Credit for 2022

94.     As noted, the VCM Contract requires an ██████████████ when the
██████████████████████████████████ ████████ pounds.  In such
cases, Blue Cube must issue a credit note to Shintech.  This occurred for ██████████,
and Blue Cube issued the appropriate credit note.  It occurred again ██████████, but
Blue Cube has refused and otherwise failed to issue a credit note despite Shintech's
requests for a $2,424,435.74 credit note.  These actions constitute a breach of contract
causing damages to Shintech.  Again, Olin guaranteed Blue Cube's performance under the
VCM Contract.

95.     Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*,
Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys'
fees and costs.

### C.     Failure to Provide Credit for 2023 Q1

96.     The VCM Contract also requires ██████████████████████████
██████████████████.  The VCM Contract requires Blue Cube to "issue the
appropriate debit or credit" within ██████████ days.  Blue Cube has failed to issue a credit
note for ██████████████████████████, which is approximately $5.8

29

million.  These actions constitute a breach of contract causing Shintech damages.  Again, Olin guaranteed Blue Cube's performance under the VCM Contract.

97.    Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*, Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys' fees and costs.

**D.    Attempt to Unilaterally Extend Major Turnaround**

98.    When supply did not resume following the required conclusion of the Major Turnaround on ▆▆▆▆▆▆▆▆, Mr. Schumacher's March 13 repudiation on behalf of Blue Cube and Olin matured into a material breach of the VCM Contract.

99.    The VCM Contract provides that a "Major Turnaround will not last more than ▆▆▆▆▆▆▆ in duration."  In October 2022, Defendants recognized this and requested an extension to ▆▆▆ days.  Shintech agreed.  The Major Turnaround was thus set to end no later ▆▆▆▆▆▆▆, requiring VCM supply to resume ▆▆▆▆▆. Supply did not resume until June 17, 2023, and then only at reduced rates with no reliable estimate of when full rates would resume.

100.    Further, Mr. Schumacher subsequently promised on behalf of Defendants to resume VCM supply within 24 hours of receiving $18,000,000 from when Shintech paid under protest.  Supply did not resume with those 24 hours, but rather only resumed on June 17, 2023 — and even then only partial supply of VCM resumed through July 12, 2023.

101.    Further, Blue Cube's actions with respect to the Major Turnaround, including Mr. Schumacher's June 16, 2023 letter asserting "unplanned equipment failures beyond our reasonable control" excused performance, were not made in good faith.

102.    The attempt to unilaterally extend the Major Turnaround has caused Shintech certain irreparable harm for which there is no adequate remedy at law. Therefore, Shintech is entitled to permanent injunctive relief.

103.    In the alternative and additionally, the unilateral extension of the Major Turnaround has caused Shintech monetary damages. Due to the way VCM was priced under Attachment C to the VCM Contract, Defendants knew that a failure to supply VCM to Shintech would ████████████████████████████████████████████ ████████████████████████████████████████████████. While it is possible that some of these damages may be quantified up to the point of trial, the VCM Contract does not end until ██████████████.

104.    Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*, Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys' fees and costs.

### E.    Breach of Obligation of Good Faith

105.    Under the Texas Business and Commerce Code, every contract imposes an obligation of good faith in its performance, and this obligation may not be disclaimed by agreement.  Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

106.    Blue Cube has neither acted with honesty-in-fact nor observed reasonable commercial standards of fair dealing under the VCM Contract.  Without limitation, this includes Mr. Schumacher abruptly cancelling Shintech's 2023 nominations of VCM based on a pricing dispute comprised of Defendants' own alleged miscalculations, which the

31

VCM Contract does not permit.  These actions are an extension of Defendants' business model in leveraging Defendants' status in the market to coerce pricing concessions from customers.

107.   Blue Cube's failure to exercise good faith includes simultaneous statements that Defendants would not follow the VCM Contract's dispute resolution procedure and subsequent decision to not send two of the three representatives previously designated to meet with Shintech (and to instead send one of Defendants' outside attorneys to the meeting without giving notice to Shintech's litigation team).  It includes Defendants' refusal to invoke the VCM Contract's audit procedure.

108.   Blue Cube also failed to act with honesty-in-fact and to observe reasonable commercial standards for fairly dealing with Shintech regarding the Major Turnaround, including the March 29 decision to cease updates on the status of the Major Turnaround, decision to "keep the spend down" for completing the Major Turnaround, promise to resume VCM supply within 24 hours of Shintech's $18 million payment under protest, and June 16 letter asserting "unplanned" equipment failures asserted retroactively to May 25, 2023.

109.   This conduct described above constitutes a breach of the VCM Contract causing Shintech damages.

110.   Pursuant to Texas Civil Practice and Remedies Code §38.001, *et seq.*, Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys' fees and costs.

## Count Three
## Breach of Contract and Guarantee by Olin

111.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

112.    As noted, on March 13, 2023, Olin's Vice President and President, Chlor Alkali Products and Vinyls, Patrick Schumacher, wrote Shintech on behalf of Olin and Blue Cube.  Mr. Schumacher alleged that pricing errors by both Shintech and Defendants resulted in $18 million in revenue that Olin was shortchanged.  Mr. Schumacher cancelled Shintech's 2023 nominations of VCM, stating "we will not provide product following our turnaround unless these matters have been fully resolved.  Mr. Schumacher also stated "we will NOT be following the contract resolution mechanism."

113.    On March 17, 2023, Shintech's General Counsel notified Mr. Schumacher that the substance of his March 13 email were "properly considered as an anticipatory breach of Contract by Olin."

114.    On March 31, 2023, Shintech again demanded that the March 13 threats be retracted and that VCM deliveries would resume immediately following completion of the Major Turnaround.

115.    On, April 6, 2023, Shintech notified Blue Cube and Olin for a third time that Shintech intended to specifically enforce "Olin/Blue Cube's obligations under the Contract."

116.    On ███████████████████████████████████████, Shintech sent yet another letter to Olin reiterating its demand that

33

Defendants perform their obligations under the VCM Contract, which Shintech expressly noted "includes the Guaranty."

117.    Olin breached the Performance Guarantee by failing to cure Blue Cube's defaults under and other breaches of the VCM Contract as described above in Count Two. Without repeating those obligations in full here, Olin breached its obligations under the Guarantee requiring the "full and prompt performance of the obligations of Blue Cube," when VCM supply did not resume ███████████, ████████████████████████ ████████████. This included, without limitation, Olin's obligations to:

    a.  Ensure supply of VCM to Shintech resume ███████████████ ██████████████████████████████████████, and not be unilaterally extended by Blue Cube;

    b.  Ensure supply of VCM resume within 24 hours of when Shintech paid $18 million under protest;

    c.  Pay Shintech the ████████████████████████;

    d.  Act in good faith in its performance of the Performance Guarantee.

118.    Shintech has performed all conditions precedent for Olin's performance under the Guarantee, including providing several notices of Blue Cube's default and demanding that Olin cure.  Alternatively, any conditions precedent have been waived or otherwise are excused.

119.    Olin's breach of its Performance Guarantee by failing to cure Blue Cube's default and by failing to act in good faith in its performance of the Performance Guarantee

has caused, and continues to cause Shintech certain irreparable harm for which there is no adequate remedy at law. Therefore, Shintech is entitled to permanent injunctive relief.

120.    In the alternative and additionally, Olin's failure to cure Blue Cube's default and failure to act in good faith in its performance of the Performance Guarantee has caused Shintech monetary damages. Due to the way the parties priced VCM under Attachment C, Defendants knew that a failure to supply VCM to Shintech would ██████████████████ ████████████████████████████████████████████████████████ ████████████████████████. While it is possible that some of these damages may be quantified up to the point of trial, the VCM Contract does not end until ████████████.

121.    On July 7, 2023, Shintech sent a payment demand to Olin pursuant to the Performance Guarantee in the amount of $27,380,000 through June 30, 2023. That amount included payment associated with the failure/refusal to supply ██████████████████ ██████████████ through June 16, 2023, the unjustified partial supply of VCM to Shintech for the period June 17 through June 30, 2023, and a ██████████████████ ██████████████ that Shintech paid.  To date, Olin has not paid.

122.    In that same July 7, 2023 letter, Shintech provided additional notification of Blue Cube's default with respect to the $18 million Shintech paid under protest on May 24, 2023, an approximately $5.8 million credit Blue Cube owed to Shintech for ████████ ██████████████, and the approximately $2.4 million Blue Cube owed to Shintech for the ██████████████████, demanding Blue Cube pay those amounts totaling $26,200,000.00  Shintech noted that should Blue Cube not do so, Shintech would follow-up with a separate demand that Olin pay those amounts.  Shintech's July 7 letter did not

consider other damages to Shintech which were not quantifiable at this time, including without limitation loss of customer good will and reputation harm. Shintech's July 7 letter was made without prejudice, and Shintech reserved all rights.

123.    Pursuant to the terms of the Performance Guarantee and Texas Civil Practice and Remedies Code §38.001, *et seq.*, Shintech is entitled to recover and hereby seeks its reasonable and necessary attorneys' fees and costs.

## Count Four
## Money Had Received Against Defendants

124.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

125.    As alleged above, on May 24, 2023 Shintech paid $18,000,000 under protest in exchange for Mr. Schumacher's express promise to resume VCM supply within 24 hours of receiving such payment under protest, which was acknowledged. VCM supply only partially resumed for the period of around June 17 – July 12, 2023.

126.    Shintech has not miscalculated the PVC Net Back payments.

127.    The $18,000,000 Shintech paid should be returned to Shintech in equity and good conscience.

128.    Further, Shintech paid ██████████████████████████████████ ████████████████████. Shintech is entitled to the return of ████████████████████, ████████████████████████████████████████████████████ ████████████████████████████████████. Shintech is further entitled to ██████████████████████████████████ pursuant to the

VCM Contract and representative of the VCM volumes not supplied from ▮▮▮▮ through

June 30, 2023.[12]

129.    Accordingly, Shintech seeks the return of money had and received with

respect to overpayments made.

### Count Five
### Unjust Enrichment Against Defendants

130.    Plaintiff repeats and re-alleges the allegations in the preceding paragraphs as

if fully set forth herein.

131.    In addition, or in the alternative, Defendants are liable under the principle of

unjust enrichment. Shintech has correctly calculated and paid for VCM pursuant to the

VCM Contract.   Allowing Defendants to retain the $18,000,000 Shintech paid under

protest and ▮▮▮▮▮▮▮▮▮▮▮ gives Defendants an undue advantage, would

be unconscionable, and otherwise is an unjust enrichment to Defendants to the detriment

of Shintech and Shintech is entitled to recover such overpayments.

### <u>Application for Injunctive Relief</u>

132.    Shintech incorporates the preceding paragraphs.

133.    The VCM Contract expressly states that Shintech is entitled to specific

performance in the event of a breach. Specifically, Section 7(b) of the VCM Contract

provides: "Except to the extent expressly limited herein, each Party reserves all rights and

remedies available to it under applicable law, including, but not limited to, the remedy of

specific performance." Exhibit 1, p. 6.

---

[12] Defendants' retention of ▮▮▮▮▮▮▮▮▮▮▮ also constitutes a breach of the VCM Contract,
Section 2(b).

134.    The Uniform Commercial Code ("UCC") governs the VCM Contract. The UCC "seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." UCC § 2-716, Cmt 1. Section 2-716 is codified into Texas law by Texas Business and Commercial Code § 2.716, which provides that "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances."

135.    VCM is a "unique" product within the meaning of Texas Business and Commercial Code § 2.716.  The circumstances of the parties' contractual and business relationship are also unique. The supply of VCM to Shintech is through a 1.3 mile long pipeline that connects the parties' respective plants. Shintech has received its VCM supply in this manner for decades, and has therefore structured its operations around such supply. Further, VCM is a highly toxic chemical that is difficult to transport and is not readily available in sufficient quantities on the open market.

136.    The refusal and/or failure to supply VCM and unilateral extension of the Major Turnaround has caused, and will continue to cause, Shintech damages that cannot fully be quantified, and for which there is no remedy at law.

137.    Without supply of VCM, Shintech has reduced PVC resin production at its Freeport, Texas VCM Plant, and will be unable to fill orders as they come due. This threatens to damage Shintech's reputation and goodwill, as customers have already reached out, anxiously inquiring about Shintech's ability to supply PVC resin.

138.    Further, the VCM Contract contains a provision by which the parties waived the right to recover consequential damages. *See* Exhibit 1, p. 6. To the extent Defendants

attempt to argue that any portion of Shintech's money damages are deemed consequential and thus unrecoverable, Shintech has no adequate remedy at law.

139.   As this Court indicated at the May 10th preliminary injunction hearing, Shintech is likely to succeed on the merits.  There is no contractual right to withhold supply of VCM based on a good faith pricing dispute, nor is there any basis for unilaterally extending the Major Turnaround under the VCM Contract.

140.   The equities likewise favor Shintech. If Defendants are enjoined, Shintech will pay ▮▮▮▮▮▮▮▮ each year, and Defendants will only be required to perform their contractual obligations. The public interest will also be served by an injunction. VCM is a highly-volatile, heavily regulated substance, which is dangerous to the public if not safely produced and transported.  Shintech cannot turn up the volume on Louisiana production capacity without extensive permitting, design, and construction processes ensuring safe operations.  VCM is required to make PVC resin, used in downstream PVC compounds and other products such as blood bags, tubing, CPR mannequins, respirator masks, PPE, IV bags, blister pack for medications, various housing and building products, municipal water and sewer systems, windows, etc.  When VCM supply drops, PVC resin supply drops, causing the price for PVC resin and products containing PVC resin to go up.  A PVC resin shortage delays access to these products.  Cutting Shintech's VCM supply will have a noticeable impact on the PVC resin market nationwide. Further, it is always in the public interest to enforce valid contractual obligations. The public interest is therefore served by the issuance of a permanent injunction.

141.    Based on the foregoing, after a trial on the merits, Shintech is entitled to a permanent injunction of specific performance requiring Defendants to continue supplying VCM (whether under the VCM Contract or the Performance Guarantee) to Shintech in accordance with the VCM Contract for the remainder of the Term.

## Jury Demand

142.    Shintech hereby demands a trial by jury.

## Prayer

**Wherefore**, Plaintiff prays that the Court enter judgment against Defendants and award the following relief:

A.    Declarations as set forth above;

B.    A permanent injunction requiring Defendants to specifically perform their obligation to supply or otherwise ensure the supply of VCM under the VCM Contract for the remainder of the VCM Contract's term;

C.    Return of money had and received and/or disgorgement of the $18,000,000 payment Shintech made under protest for the resumption of VCM Supply and;

D.    Damages naturally and necessarily flowing from Defendants' breaches of the VCM Contract and the Guarantee;

E.    Plaintiff's reasonable attorneys' fees under Texas Civil Practice and Remedies Code §38.001 and the Performance Guarantee;

F.    All costs of suit;

G.    Pre- and post-judgment interest; and

H.    All other and further relief, at law and in equity, to which Plaintiff may show itself to be justly entitled.

Dated: July 14, 2023.                    Respectfully submitted,

                                 By: */s/ David W. Salton*
                                     David W. Salton
                                     ***Attorney in Charge***
                                     State Bar No. 24062982
                                     Southern District ID: 922955
                                     mailto:dsalton@porterhedges.com
                                     **PORTER HEDGES LLP**
                                     1000 Main Street, 36th Floor
                                     Houston, Texas 77002
                                     Telephone: (713) 226-6711
                                     ***Attorney for Plaintiff Shintech Incorporated***

**OF COUNSEL**
Stephanie L. Holcombe
State Bar No. 24069939
Southern District ID: 1074764
mailto:sholcombe@porterhedges.com
Telephone: (713) 226-6204
Neil Kenton Alexander
State Bar No. 996600
Southern District ID: 1283
kalexander@porterhedges.com
Telephone: (713) 226-6614
Jonathan M. Pierce
State Bar No. 24121423
Southern District ID: 23801
jpierce@porterhedges.com
Telephone: (713) 226-6694
Jack E. Byrom
State Bar No. 24082763
Southern District ID: 2406693
jbyrom@porterhedges.com
Telephone: (713) 226-6702
Elliott J. Deese
State Bar No. 24121423
Southern District ID: 3723396
edeese@porterhedges.com
Telephone: (713) 226-6620
**PORTER HEDGES LLP**
***Attorneys for Plaintiff Shintech Incorporated***

**<u>Certificate Of Service</u>**

I hereby certify that on July 14, 2023, a true and correct copy of the foregoing document was served via email and certified mail, return receipt requested to the following persons:

Matthew D. Fender
mfender@mcguirewoods.com
McGuireWoods
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916

Yasser A. Madriz
YMadriz@mcguirewoods.com
McGuireWoods
Texas Tower
845 Texas Ave., FL 24
Houston, TX 77002-2906

Robert Redmond
RRedmond@mcguirewoods.com
McGuireWoods
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916

Jason Huebinger
JHuebinger@mcguirewoods.com
McGuireWoods
Texas Tower
845 Texas Ave., FL 24
Houston, TX 77002-2906

*/s/ David W. Salton*
David W. Salton