United States District Court
Southern District of Texas
**ENTERED**
August 18, 2025
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:23-cv-112

SHINTECH INCORPORATED, *PLAINTIFF*,

v.

OLIN CORPORATION, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Shintech moved for partial summary judgment in August 2024, arguing the term "PVC" in the parties' contract refers only to the product it makes directly from VCM—grades of polyvinyl-chloride resin—not downstream products that contain resin as an ingredient. Dkts. 342 (redacted), 343 (sealed). The defendants propose a broader definition but ultimately argue "PVC" is a latently ambiguous term that presents a fact question for the jury. Dkts. 356 (redacted), 357 (sealed). For the reasons that follow, the court withdraws its order adopting the magistrate judge's memorandum and recommendation denying Shintech's motion for partial summary judgment, Dkt. 442, and grants the motion, Dkts. 342, 343.

## I.    Background

Blue Cube Operations, LLC, a subsidiary of Olin Corporation, produces vinyl-chloride monomer ("VCM"). Dkts. 343-1 at 1; 398 ¶ 1. Shintech polymerizes VCM to produce polyvinyl chloride ("PVC"). Dkt. 398 ¶ 1. That is the only method of PVC production, and PVC is the only product Shintech manufactures. Dkts. 373 at 15; 398 ¶ 20. Shintech sells PVC to its affiliates and to third parties, who blend the PVC with other ingredients to create PVC compounds. Dkt. 398 ¶ 20. Third parties use those compounds to manufacture end-products like PVC pipe, vinyl siding, window profiles, fencing, and film wrap. *Id.* These end-products can be made only from PVC compound, not PVC alone. *Id.*

In February 2017, Blue Cube contracted with Shintech to supply it with VCM from 2021 to 2030. *Id.* ¶¶ 46–47. Shintech and Blue Cube operate separate chemical plants in Freeport, connected by a 1.3-mile pipeline through which Blue Cube delivers VCM. *Id.* ¶ 192. Despite being two of the largest, most sophisticated chemical producers in the world, Blue Cube and Shintech did not define the term "PVC" in their contract.[1] Dkt. 343 at 15. Texas law governs the contract, and Olin guaranteed Blue Cube's

---

[1] In the words of a titan from another industry, "It'd be a lot cooler if [they] did." DAZED AND CONFUSED (Detour Filmproduction 1993).

performance. Dkts. 343-1 at 7; 398 ¶ 58.

Quantity is straightforward under the contract. Shintech must notify Blue Cube how much VCM it wants to buy for the upcoming year by June 30, and Blue Cube has two months to tell Shintech how much it will supply. Dkt. 343-1 at 1. Blue Cube agreed to provide at least 1.5 billion pounds of VCM each year between 2021 and 2023. *Id.* Shintech pays about $20.6 million per year to reserve the right to purchase VCM from Blue Cube. *Id.* at 4.

Pricing is more complicated. The contract does not have a fixed price for VCM. Instead, it follows a complex pricing formula and invoicing procedure that contemplates all components of the integrated PVC supply chain. *Id.* at 9–17. The parties define the VCM price as the "sum of the monthly cash cost of ethylene and production for chlorine, EDC and VCM plus [Blue Cube's] share of the total margin." *Id.* at 11. Ethylene, chloride, and EDC are the chemical precursors to VCM. Dkt. 398 ¶¶ 16–17. In other words, the contract includes a cost-plus based pricing model where the "plus" is determined by considering the margin on the product made with VCM. Blue Cube invoices Shintech monthly at an estimated price for the VCM delivered; Shintech pays Blue Cube a "PVC net back" for the PVC it produces from the VCM; and Blue Cube pays Shintech a "caustic net back" for the caustic soda Blue Cube produces and sells as by-product of VCM. Dkt.

343-1 at 9–17. Blue Cube may adjust the VCM price based on the contract's pricing formula before issuing the appropriate debits and credits. *Id.* at 9. If either party disputes a PVC or caustic-soda net back's accuracy, it may request and receive a statement of audit performed by the other party's independent public accountant. *Id.* at 20.

A dispute arose over pricing in March 2023. Dkt. 398 ¶¶ 82–83. Olin and Blue Cube refused to supply VCM to Shintech until the parties resolved the dispute. *Id.* ¶ 84. Shintech sued Olin and Blue Cube for breach of contract the following month. *Id.* ¶ 98. A lot has happened since. The court denied Shintech's motion for preliminary injunction in May 2023, Dkt. 54, and the PVC-interpretation dispute arose several months later, *see* Dkt. 666 at 8–14. The court denied the defendants' motion to dismiss Shintech's second amended complaint, Dkt. 224, denied Shintech's motion for partial summary judgment, Dkts. 412, 442, and denied the defendants' partial motion to dismiss, Dkts. 413, 443. The parties have engaged in a myriad of petty discovery and document-sealing disputes.[2] Trial is set for October. Numerous pretrial motions are pending before the court.

---

[2] "Damnable both-sides rogue!" WILLIAM SHAKESPEARE, ALL'S WELL THAT ENDS WELL act 4, sc. 3, l. 236.

Upon further review of the briefing, the pleadings, and the record, the court requested and convened a hearing on the PVC-definition issue on July 30, 2025, *sua sponte* reconsidering its order adopting the magistrate judge's memorandum and recommendation denying Shintech's motion for partial summary judgment, Dkt. 442.

## II.    Legal Standard

A district court may modify an interlocutory order for any reason it deems sufficient at any time before final judgment. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of contract interpretation, a material fact issue precluding summary judgment exists "only when there is a choice of reasonable interpretations of the contract." *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (citation omitted); *see also Hoover Panel Sys., Inc. v. HAT Cont., Inc.,* 819 F. App'x 190, 195 (5th Cir. 2020) ("[S]ummary judgment is not appropriate where . . . multiple permissible interpretations exist.").

The court's "primary objective" in contract interpretation is "to ascertain the intentions of the parties *as expressed in the contract*." *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th

Cir. 2013) (emphasis added). That requires "examin[ing] and consider[ing] *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Hoover*, 819 F. App'x at 195 (citation omitted).

The court must first determine whether the contract is ambiguous. "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Gonzalez*, 394 F.3d at 392 (citation omitied); *see also McLane*, 736 F.3d at 378 (stating ambiguity means more than a lack of clarity or differing interpretations). The text is the "alpha and omega of the interpretive process" and, obviously, "extrinsic evidence is never the place to start." *Kan. City S. RR. Co. v. Sasol Chems. (USA), L.L.C.*, 113 F.4th 446, 450, 451 (5th Cir. 2024) (citation omitted). The court should "determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Id.* at 450 (citation omitted). Dictionary definitions are helpful to that end. *See Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) (when a contract does not define a term, courts presume parties intend the generally accepted meaning and frequently consult dictionaries to discern common-usage meaning). Context—meaning the "surrounding words and structure of the operative text"—is also a "primary determinant of meaning," particularly

when dealing with undefined terms. *U.S. Polyco, Inc. v. Tex. Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 n.3 (Tex. 2023) (citation omitted); *Brown v. City of Hous.*, 660 S.W.3d 749, 754 (Tex. 2023) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012)). The presence of ambiguity and the interpretation of an unambiguous contract are questions of law for the court. *Gonzalez*, 394 F.3d at 392.

If, however—after applying the established rules of interpretation—the contract language is "subject to two or more reasonable interpretations," then it is ambiguous and raises a fact issue for the jury. *Id.*; *Dynamic Pub. & Distrib. LLC v. Unitec Indus. Center Prop. Owners Ass'n, Inc.*, 167 S.W.3d 341, 345 (Tex. App.—San Antonio 2005, no pet.). "Contract ambiguity comes in two flavors: patent or latent." *URI Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018). Patent ambiguity is evident on the contract's face without resorting to extrinsic evidence. *Nat'l Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Extrinsic evidence is admissible to show the parties' intent only *after* the court finds patent ambiguity. *Id.* Latent ambiguity, on the other hand, "arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter." *Id.* Importantly, "the ambiguity must become evident when the contract is read

in context of the surrounding circumstances, not after parol evidence of intent is admitted to create an ambiguity." *Id.* at 521. Accordingly, when a party alleges latent ambiguity, the court may consider limited extrinsic evidence of surrounding facts and circumstances to give meaning to the disputed term—but not to "show the parties' motives or intentions apart from the language employed in the contract." *URI Inc.*, 543 S.W.3d at 767 (quotations and citation omitted) (clarifying the "distinction between extrinsic evidence that illuminates contract language and extrinsic evidence that adds to, alters, or contradicts the contract's text").[3]

## III. Analysis

Shintech argues the meaning of "PVC" under the parties' agreement is patently unambiguous and means "grades of polyvinyl[-]chloride resin." Dkt. 343 at 6. Put simply, PVC is like flour: it is used to make many things, like cake. But just because cake has flour in it does not mean cake is flour. In the

---

[3] "For example, if a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on the street, it would be latently ambiguous." *Nat'l Union*, 907 S.W.2d at 520 n.4. But if the contextual evidence reveals no ambiguity, *i.e.*, there is only one green house on Pecan Street, then "extrinsic evidence that the parties actually intended for the goods to be delivered to the blue house on Pecan Street would not be admissible to alter unambiguous contract language requiring delivery to the green house." *URI Inc.*, 543 S.W.3d at 766. "Nor would the contract's *meaning* be informed by extrinsic evidence that the parties intended additional requirements or constraints that were not expressed in the agreement—such as delivery by 5:00 p.m. or only on Sundays." *Id.*

same way, PVC is not pipe, even though PVC is a key upstream ingredient in the pipe-manufacturing process. *Id.* at 33. Under this reading, Shintech need only include sales of polyvinyl-chloride resin in the PVC-net-back calculation—not sales of PVC compound and other downstream products produced by Shintech's affiliates and third parties. *Id.* Shintech asserts this position is consistent with the objective intent manifested in the agreement and in PVC's plain meaning and harmonizes all 98 uses of "PVC" throughout the text. *Id.* at 15–23.

Blue Cube and Olin offer a broader reading. In their view, "PVC" in the contract means "a general use plastic polymer that has wide application in a large variety of industrial materials and goods used in daily life, including vinyl siding and pipes." Dkt. 357 at 21. The defendants contend "PVC" refers to resin *and* downstream products containing resin as a component, *i.e.*, the full range of industrial and commercial products made using polyvinyl-chloride resin. *Id.* at 20–21. The defendants assert their interpretation is consistent with PVC's colloquial use in commercial practice, where the term operates as a catch-all for resin, compounds, and end-products. *Id.*

The court agrees with Shintech. Interpreting "PVC" to mean "grades of polyvinyl-chloride resin" gives the term a certain and definite meaning consistent with (1) the objective intent manifested on the contract's face, *i.e.*,

the text, context, and structure; (2) the plain and ordinary meaning of the term; and (3) the 98 other appearances of "PVC" in the contract.

## A. Text, context, and structure

"Words must be read with the gloss of the experience of those who framed them." *U.S. v. Rabinowitz*, 339 U.S. 56, 70 (1950) (Frankfurter, J., dissenting). To understand the parties' intent for the term "PVC" at the time of formation, the court begins by examining the text, context, and structure of the agreement. For the reasons below, the court finds Shintech's interpretation gives "PVC" a certain and definite meaning consistent with the objective intent manifested on the contract's face.

Because the PVC-net-back provision is at the heart of this dispute, the court starts there. The parties define the PVC net back as "the weighted average delivered selling prices . . . for the PVC produced by [Shintech] and its U.S. Affiliates . . . regardless of whether ***the PVC is made with*** [Blue Cube's] ***VCM***, any other supplier's VCM, or VCM produced by [Shintech] or a [Shintech] Affiliate." Dkt. 343-1 at 16 (emphasis added). The contract clearly defines PVC as the product that is made with VCM. And the only product made with VCM is grades of polyvinyl-chloride resin. *Id.*[4] Everyone

[4] The parties do not dispute the production chain is as follows: VCM → PVC resin → PVC compound → PVC end-products.

agrees downstream products like PVC compound, pipes, and window siding include PVC resin as an ingredient, not VCM. Dkt. 343 at 19.

The PVC-net-back provision contains illustrations that support Shintech's interpretation. The parties agreed "[t]he PVC Net Back shall only include PVC first sold by [Shintech], or by or through a [Shintech] Affiliate, to a third party that is not a [Shintech] Affiliate." Dkt. 343-1 at 16. The agreement provides two examples:

> Illustration A: If [Shintech] sells or transfers ***PVC*** to an Affiliate for $0.40 per pound, and that Affiliate then sells ***the PVC*** to a third party that is not an Affiliate of [Shintech] for $0.50 per pound, then the sale from the [Shintech] Affiliate to the third party that is not an Affiliate of [Shintech] ($0.50) is included in the PVC Net Back.

> Illustration B: If [Shintech] sells or transfers ***PVC*** to an Affiliate for $0.40 per pound, and that Affiliate then sells ***the PVC*** to another [Shintech] Affiliate for $0.50 per pound, and the second Affiliate then resells ***the PVC*** to a third party that is not an affiliate of [Shintech] for $0.60 per pound, then the sale from the second Affiliate to the third party that is not an Affiliate of [Shintech] ($0.60) is included in the PVC Net Back.

*Id.* (emphasis added). The illustrations' use of the definite article "*the* PVC" indicates the product Shintech sells or transfers to its affiliates and the product Shintech's affiliates resell to a third party are one and the same—resin, the only thing Shintech produces—not a downstream product made from resin. *See, e.g.*, *Nielsen v. Preap*, 586 U.S. 392, 408 (2019) ("[G]rammar and usage establish that 'the' is a function word indicat[ing]

that a following noun or noun equivalent is definite or has been previously specified by context." (cleaned up) (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1294 (11th ed. 2005))).[5]

The VCM-pricing mechanism also provides the "pricing concept [would] include all the components in the PVC chain (ethylene, chlorine, EDC, VCM, and PVC)." Dkt. 343-1 at 11. The PVC chain stops with the first product made from VCM: the grades of polyvinyl-chloride resin Shintech sells. *Id.* The contract's inclusion of all components leading up to producing PVC resin shows that downstream products, which are made with PVC resin but not VCM, were not intended to be part of the pricing scheme. *See also N.L.R.B. v. S.W. Gen., Inc.*, 580 U.S. 288, 302 (2017) (discussing interpretive canon *expressio unius est exclusio alterius*, which provides "expressing one item of [an] associated group or series excludes another left unmentioned").

Moreover, the parties agreed Blue Cube's VCM would be "solely for Customer's consumption or use." Dkt. 343-1 at 1. The contract defines Shintech—and Shintech only—as "Customer." *Id.* Shintech produces and sells only grades of polyvinyl-chloride resin—nothing else. Shintech's affiliates and non-affiliated third parties who produce PVC compounds or

---

[5] The agreement contains similar illustrations using the definite article "the" in the caustic-net-back calculation provision. Dkt. 343-1 at 13.

downstream products do not "consum[e] and use" VCM because it is not a component of the products they manufacture. Dkt. 343 at 19. Accordingly, this provision suggests the parties intended for the scope of the agreement to be limited to Shintech and Blue Cube's operations alone. Dkt. 343-1 at 1.

Despite the clear textual basis Shintech provides to support its narrow reading, the defendants argue the contract's text supports their broader interpretation. First, the defendants point to Illustrations A and B in the PVC-net-back provision. Dkt. 357 at 28. In both examples, the price of PVC increases as it moves through transactions between Shintech and its affiliates before reaching a non-affiliated third party. *See* Dkt. 343-1 at 16. The defendants argue this price increase reflects the added value from converting resin into compound or other downstream products, and therefore the PVC net back must include sales of these processed versions. Dkt. 257 at 28. Doubtful, for at least two reasons. First, these are just illustrations—hence the helpful labels—that simply reflect the potential for price increases as PVC gets sold from Shintech to an affiliate to a third party, *i.e.*, from commissions or other downstream costs. Second, the illustrations for the caustic-soda-net-back provision include the same minor mark up for downstream sales of caustic soda. Dkt. 343-1 at 13. Yet the defendants do not contend the increase in caustic-soda prices is due to caustic soda's transformation into some other

more valuable product.

The defendants also contend Shintech's interpretation would render the phrase "U.S. Affiliates" in Illustrations A and B meaningless because none of Shintech's U.S. affiliates resell PVC resin. Dkt. 357 at 23–26. But that's not the full picture. "U.S. Affiliate" is used once in the contract in reference to the "the PVC *produced by* [Shintech] and its U.S. affiliates." Dkt. 343-1 at 16. Shintech Louisiana LLC, a Shintech affiliate, produces and sells polyvinyl-chloride resin, just like Shintech. Dkt. 343 at 9 n.8. That was the case in 2017 and still is today. And Shintech Louisiana's sales have always been included in the PVC-net-back calculation. *Id.*

Lastly, the defendants assert the cost-related provisions, such as the PVC-integrated supply chain, are meant to function as flexible, negotiated benchmarks, not rigid definitions, and reflect a broader commercial understanding of the term "PVC." Dkt. 357 at 33. But such a reading would lead to the very thing the defendants accuse Shintech's interpretation of—the court would have to pencil in terms and conditions for which the parties obviously did not bargain. The court would also run afoul of the general rule that where one or more things of a class are expressly mentioned, others of the same class are necessarily excluded. *See N.L.R.B.*, 580 U.S. at 302.

In short, the court finds the defendants' proposed interpretation of

"PVC" unreasonable considering the contract's text, context, and structure. Accepting the defendants' reading would be akin to interpreting the word "flour" to include not only the powder made from grain, but also bread, cakes, pasta, and pastry, simply because flour is used to make those products. You don't have to be a scientist or a baker (or even a judge) to see that that's wrong. *See Kan. City S. Ry. Co.*, 113 F.4th at 451 (interpretation is unreasonable if it creates absurd results, and "[a]n absurd interpretation . . . cannot cause a contract to be ambiguous").

## B. Plain meaning

The plain and ordinary meaning of the term "PVC" further supports Shintech's interpretation. Words are to be understood according to their ordinary, everyday meaning, unless the context indicates they bear a technical sense. Here, "PVC" has a colloquial meaning—everyone's seen PVC pipe at The Home Depot—but also a technical meaning used by those in the chemical industry. "PVC" in the parties' agreement unquestionably falls in the latter category.

Standard dictionaries define polyvinyl chloride as a resin. For example, Webster's New World College Dictionary defines "PVC" as "a polymer of vinyl chloride; esp: a thermoplastic resin ($CH_2CHCl$) that is characterized by chemical inertness, resistance to weathering, electrical resistivity, and

rigidity unless it is plasticized and that is used chiefly for electrical insulation, coated fabrics, films, sheets, and pipes." *PVC*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1184 (5th ed. 2014) (redirected from *polyvinyl chloride* on p. 1132). The use of "esp." (especially) to introduce the second definition indicates that the "thermoplastic resin" meaning is the most common usage of the term and included within the broader definition. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ([E]sp. "is used to introduce the most common meaning included in the more general preceding definition" (quoting 12,000 WORDS: A SUPPLEMENT TO WEBSTER'S THIRD 15a (1986))).

Other technical and general dictionaries confirm this resin-based understanding. American Heritage defines polyvinyl chloride as "a common thermoplastic resin used in a wide variety of manufactured products," including pipe and other items. *Polyvinyl chloride*, AMERICAN HERITAGE DICTIONARY 1368 (5th ed. 2016). McGraw-Hill's Dictionary of Chemistry Terms defines polyvinyl chloride as "a polymer of vinyl chlorides . . . a member of the family of vinyl resins; used in soft flexible films for food packaging and in molded rigid products such as pipes," among other uses. *Polyvinyl chloride*, MCGRAW-HILL DICTIONARY OF CHEMISTRY TERMS 302 (2d ed. 2003).

American Heritage's definition of "vinyl chloride," the monomer used

to produce PVC, also supports Shintech's interpretation. That dictionary defines vinyl chloride as "a toxic and carcinogenic colorless flammable gas . . . having a sweet odor and used as a monomer for polyvinyl chloride." *Vinyl chloride*, AMERICAN HERITAGE DICTIONARY 1933 (5th ed. 2016). This definition reinforces the symbiotic relationship between VCM and PVC and suggests the parties understood "PVC" under the contract to mean grades of resin derived directly from VCM. Dkt. 343 at 16.

Industry guidelines also track. The American Society for Testing and Materials' (ASTM) standards are the only standards incorporated into the agreement, and ASTM defines polyvinyl chloride as "a polymer prepared by the polymerization of [VCM]." ASTM STANDARD D883-12E01, Standard Terminology Relating to Plastics at 3, 9 (2012); Dkt. 343-1 at 8. ASTM also draws a clear distinction between "polyvinyl chloride" and a "compound," defining the latter as "an intimate admixture of polymer(s) [e.g., PVC] with all the materials necessary for the finished product." ASTM STANDARD F412-16A, Standard Terminology Relating to Plastic Piping Systems at 6, 14 (2017).

Finally, federal regulatory definitions are consistent with the industry and dictionary definitions cited above. Dkt. 343 at 17–18. For example, EPA regulations promulgated under the Clean Air Act define polyvinyl chloride as "a synthetic thermoplastic polymer that is derived from the simultaneous

polymerization of vinyl chloride." 42 C.F.R. § 63.12005 (current since 2012). This regulatory understanding aligns with the definition of "PVC" as a resin created directly from VCM, not as a reference to downstream products with resin as one of many ingredients.

The defendants cite several general-use dictionary definitions of "PVC" that refer to its application in downstream products. Dkt. 357 at 21. For example, Merriam-Webster's Collegiate Dictionary defines polyvinyl chloride as "a polymer of vinyl chloride used esp. for electrical insulation, films, and pipes." *Polyvinyl chloride*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 963 (11th ed. 2009). The defendants argue these definitions demonstrate a broader common-usage understanding of "PVC"—one that encompasses end-products made from resin and not just resin itself. Dkt. 357 at 21. But even if this is true, it neither makes Shintech's interpretation unreasonable nor counteracts the objective support for a narrow definition of "PVC" in the contract itself.

The defendants make much of an industry-specific definition pulled from a 1996 textbook. *Id.* In PVC: PRODUCTION, PROPERTIES AND USES, George Matthews writes:

> In the plastics industry the terms PVC or pvc are used indiscriminately to describe a wide variety of different products characterized only by the fact that they are based on polymers of vinyl chloride . . . . [The word resin] has since passed into more

> general usage to distinguish those polymers which are not
> rubber-like from those which are . . . ."[R]esin" is sometimes
> useful in distinguishing polymers as such from compositions
> containing them.

*Id.* This suggests industry-experts use "PVC" imprecisely to describe a family of products based on vinyl-chloride polymers, not solely the unprocessed resin. That is helpful to the defendants' cause.

But while a court may consult leading dictionaries to determine the ordinary meaning of contractual terms, it must stop short of entertaining subjective interpretations in scholarly works. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 211 (5th Cir. 2007) ("Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning."). However credible the author may be, the quoted material is based on Matthews' personal experience in the industry from 1946–1964; in other words, it is parol evidence. Dkts. 373 at 12 n.16; 373-1. Moreover, Matthews published his book over 20 years before the parties contemplated their agreement. The court finds Matthews' interpretation of "PVC" is inadmissible for the purposes of identifying ambiguity, and so it's unhelpful to the court's interpretation of "PVC" in the parties' contract. *See Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc.*, 117 F.3d 180, 191 (5th Cir. 1997) (the court may consider parol evidence only after it applies the "established rules of interpretation" and finds the text ambiguous (citation

omitted)).

## C. Harmony

The court also considers the 98 uses of the term "PVC" throughout the contract and finds Shintech's interpretation provides a consistent and rational meaning to each one. *See, e.g.*, *Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 112–13 (5th Cir. 2008) ("An interpretation that gives a reasonable meaning to all provisions is preferable to one that leaves a portion of the [contract] useless, inexplicable, or creates surplusage."); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same [agreement] are intended to have the same meaning.").

"PVC," as used throughout the entire agreement, indicates the parties contemplated this contract would capture only Blue Cube and Shintech's activities, not those of affiliates and third parties. This aligns with Shintech's narrower reading of "PVC" to mean only the product Shintech produces: resin. First, the agreement provides "Seller and Customer may each be referred to as a 'Party' and together referred to as the 'Parties.'" Dkt. 343-1 at 1. The "Parties" agreed to "meet quarterly to exchange information on sales

forecasts, production schedules," and any other information "pertinent to efficient operation of their respective facilities." *Id.* at 2. The information to be exchanged is limited to the "Parties." *Id.* Accordingly, the court finds the contract requires Shintech to share information only as to its own sales and production within its facility.

Similarly, the delivery terms provide Blue Cube will deliver VCM through the pipeline connecting its plant to "[Shintech]'s PVC production facilities," and the force majeure clause refers expressly to interference with "the production . . . at any of the facilities owned by Seller or Customer that produce EDC, VCM, or PVC covered by this Contract." *Id.* at 2, 4. The facility that produces PVC "covered by the contract" is Shintech's Freeport facility, which everyone agrees makes only polyvinyl-chloride resin.[6] Moreover, each instance of the term "PVC" refers directly to the operations of the "Customer," defined in the contract as Shintech. *See* Dkt. 343 at 20–22 (summarizing examples); *Matter of Pirani*, 824 F.3d 483, 496 (5th Cir.

---

[6] The contract refers to Shintech's and Blue Cube's respective Freeport facilities, and Shintech's affiliate K-Bin purportedly shares space with Shintech there. Dkt. 357 at 32. The defendants argue K-Bin's operations should therefore be included in the pricing-and-cost framework contemplated by the agreement. *Id.* And because K-Bin produces compound in the vicinity of Shintech's PVC production, the defendants assert that Shintech's facility itself must be capable of producing PVC compound. *Id.* at 32, 34. The court fails to see how that matters. The definition of "Parties" does not include K-Bin, and nothing in the text indicates that K-Bin's operations are included in the quantity clause based merely on physical proximity to Shintech's operations.

2016) (binding parties to their definition of "the Company" because the court is "not at liberty to disregard [the] definitions set forth by the parties" (quotations and citation omitted)). Again, the only product Shintech produces is grades of polyvinyl-chloride resin. Dkts. 343 at 27.

The tax provision follows the same logic. The agreement assigns responsibility for taxes "imposed . . . on the sale or use of VCM, caustic soda, and/or PVC," requiring the "Party who will be required to pay such tax [to] notify the other of the applicability." Dkt. 343-1 at 4–5. The term "Party" can mean only Shintech or Blue Cube, not any third party. *Id.* Under the defendants' interpretation, the agreement would require Shintech to pay taxes on downstream products it neither sells nor produces and provide Blue Cube with notice of such payments. That makes no sense.

The provision explaining how to calculate the PVC net back includes similar limitations. *Id.* at 16. It incorporates Shintech's expenses such as freight, sales commissions, terminal costs, bagging costs,[7] and accounts-receivable financing. *Id.* The court finds these items reflect the costs of delivering and selling only the grades of polyvinyl-chloride resin Shintech makes. *Id.*

---

[7] Another context clue: resin can be "bagged" for shipment, while finished products like siding, window frames, or garden hoses are not transported in that manner.

For all these reasons, the court finds Shintech's interpretation harmonizes the use of "PVC" throughout the contract.[8]

The same cannot be said for the defendants' interpretation. For example, the defendants concede their definition does not work in the PVC cash-cost provision—a critical component of the formula for determining VCM cost. Dkt. 343-1 at 15 ("The cash cost of the production of PVC shall be the sum of . . . VCM cash cost, cash conversion costs, natural gas costs, power costs, costs associated with interest on working capital, and RSA costs."). The "cash cost of production of PVC," according to the defendants, unequivocally means the cost to Shintech for converting VCM supplied by Blue Cube (or others) into resin—notwithstanding the absence of "resin" from the text. Dkts. 343-1 at 16; 666 at 63:15–24. The defendants' interpretation would require inclusion of downstream products in the PVC-net-back calculation, yet they provide no basis for excluding the costs associated with producing those downstream products when calculating the VCM price.

---

[8] The court finds the defendants' assertion that such a conclusion would run afoul of the omitted-case canon unpersuasive. Dkt. 666 at 32:8–25, 33:1–2, 34:1–14. True, courts are "prohibit[ed] . . . from adding to what the text states or reasonably implies in an effort to fill a judicially perceived gap." *EIS Dev. II, LLC v. Buena Vista Area Ass'n*, 715 S.W.3d 689, 692 (Tex. 2025). But that is not what is going on here. The court is not penciling in extra words the parties have not bargained for. Based on the plain meaning of "PVC" and the structure and content of the contract as a whole, the court finds the text "reasonably implies" that "PVC" means grades of polyvinyl-chloride resin. *Id.*

### D. Evidentiary objections

It does not help the defendants that their interpretation is founded on wholly inadmissible parol evidence. The court's ability to consider extrinsic evidence when interpreting a contract is extremely limited. Indeed, it is the exception, not the rule. *See Kan. City S. Ry. Co.*, 113 F.4th at 451. The court's first task is to determine whether the contract is unambiguous on its face—and it must do so without looking to extrinsic evidence. If the court finds the agreement patently unambiguous and a party asserts the contract contains latent ambiguity, the court may then consider *limited* extrinsic evidence of the surrounding facts and circumstances to illuminate the term's meaning. *Nat'l Union*, 907 S.W.2d at 520–21. Parties may not offer extrinsic evidence of the parties' intent to *create* an ambiguity and then sound the latent-ambiguity alarm. *URI Inc.*, 543 S.W.3d at 764–66. But that's just what the defendants attempt here. The defendants seemingly concede the agreement is patently unambiguous—a prerequisite to raising latent ambiguity. The defendants may offer extrinsic evidence of the facts and circumstances at formation to reveal "PVC" has multiple reasonable meanings. That is, the evidence must tend to reveal the proverbial second green house on Pecan Street—a situation where an apparently unambiguous term becomes unclear in context. *Nat'l Union*, 907 S.W.2d at 520 n.4.

But the record contains no such showing. Everyone agrees the contract deals with PVC "made with VCM." Dkt. 343-1 at 16. The defendants offer no evidence of surrounding facts and circumstances at the time of formation to persuade the court that "PVC" means something more than just grades of resin. For example, no evidence suggests that PVC compounds manufactured by Shintech affiliates, such as K-Bin, are made "with VCM" in the same way resin is. *Id.* Nor does any evidence show that affiliates or third parties make end-products "with VCM." *Id.*

Instead, the defendants offer various bits of extrinsic evidence purporting to show the parties' intent. For example, the defendants cite Shintech Vice President Toshiaki Ansai's deposition testimony from a Canadian lawsuit involving caustic soda six years after the parties entered the contract here. Dkt. 357 at 7. Ansai describes PVC as "a general use plastic polymer that has wide application in a large variety of industrial materials and goods used in daily life, including vinyl siding and pipes." *Id.* This is, at bottom, one person's subjective interpretation of "PVC." Whatever Ansai believes PVC to mean—six years after the parties formed the contract—is not admissible to reveal the parties' intent in 2017. And even if considered, Ansai's statement does not defeat Shintech's interpretation. PVC may very well have a wide range of applications without rendering the term

synonymous with products made from it. Deposition testimony from Shintech's former corporate secretary, Richard Mason, is inadmissible parol evidence for the same reasons. *Id.* at 6 ("Different people will use 'PVC' to talk about products, to talk about compound, and to talk about resin. It's used fairly loosely and fairly generically up and down the industry.").

The defendants also rely on a 2008 contract between Shintech and Dow for VCM. *Id.* at 8–10; Dkt. 357-7. According to the defendants, the parties modeled the first draft of the 2017 contract on this earlier agreement. Dkt. 357 at 8–10. In the Dow agreement, Shintech-affiliate sales of all forms of PVC were included in the PVC net back, subject to an exception allowing certain affiliate sales to be excluded if they fell below the weighted average of the general net back. *Id.* The defendants also point to Dow's internal negotiation notes, which, they claim, reflect concerns that Shintech would manipulate affiliate sales to reduce its obligations under the PVC net back. *Id.*

This, too, is inadmissible parol evidence. Given that "evidence of negotiations and prior drafts [between the parties] are prohibited by the parol evidence rule" once a court finds a contract ambiguous, the court fails to see how the Dow-Shintech agreement is relevant at all. *Kan. City S. Ry. Co.*, 113 F.4th at 451. A contract between different parties executed ten years

before the contract here does nothing to reveal the surrounding facts and circumstances that give meaning to "PVC" in 2017 between Shintech and Blue Cube.

### E. Effect on other claims and defenses

The court finds "PVC" means grades of polyvinyl-chloride resin, and that decision has ripple effects. Shintech seeks partial summary judgment on its declaratory-judgment claims nos. 4–6. Dkts. 343 at 32–33; 398 ¶ 130; 666 at 75:7–23. Those declarations are, as follows:

> (iv) The 2021 VCM Contract does not require the parties to include in their respective netback calculations transactions between the parties' and their Affiliates who use the PVC or caustic soda (as the case may be) in their own process for making a different product, but instead only requires the parties to include in their respective netback calculations transactions where the Affiliate resells the PVC or caustic soda (as the case may be);

> (v) The 2021 VCM Contract does not require the parties to include in their respective netback calculation prices of downstream products sold by the parties' Affiliates;

> (vi) The PVC Netback includes PVC sold or transferred by Shintech to an Affiliate, or by or through a Customer Affiliate, to a third party who is not a Shintech Affiliate **only when** the PVC sold or transferred by Shintech to an Affiliate is not used by the Affiliate to make other products (e.g., compound or pipe) that are sold by the Affiliate to a third party who is not a Shintech Affiliate[.]

Dkt. 398 ¶ 130. The court's finding that "PVC" under the contract means "grades of polyvinyl-chloride resin" (declaratory-judgment claim no. 3)

necessarily resolves claims nos. 4–6. Accordingly, the court grants Shintech's motion for summary judgment as to declaratory-relief claims nos. 4–6. Dkts. 343 at 32–33; 393 ¶ 130.

Shintech also seeks partial summary judgment that Shintech properly included only sales of PVC resin by Shintech or its affiliates to non-affiliated third parties when calculating the PVC net back in connection with its money-had-and-received and unjust-enrichment claims. Dkts. 343 at 7; 398 ¶¶ 180–188. Because these claims contain as an essential element the conclusions set forth by declaratory-judgment claims nos. 3–6, the court grants partial summary judgment insofar as it relates to this element of Shintech's money-had-and-received and unjust-enrichment claims.

The above rulings resolve Blue Cube's counterclaims predicated on its broader interpretation of "PVC." Dkt. 343 at 34–35. Shintech contends a ruling in its favor on declaratory-judgment claims nos. 3–6 dooms Blue Cube's affirmative claims for declaratory judgment (count one), breach of contract as to Shintech's calculation of the PVC net back (count two), breach of good faith (count three), and unjust enrichment (count four). *Id.*; Dkt. 278 ¶¶ 121–55. Blue Cube does not contest this, except regarding the good-faith claim. Dkt. 666 at 76:13–25, 77:1–3, 81:14–19.

Because Blue Cube's declaratory-judgment claims seek a competing

interpretation that the court has found unreasonable, the court dismisses count one. Dkt. 278 ¶¶ 121–25. Blue Cube's breach-of-contract claim, count two, is dismissed insofar as it is predicated on the contention that Shintech breached the contract by not including sales of compounds and other downstream products produced by Shintech affiliates and third parties in the PVC net back. *Id.* ¶¶ 126–139. Count four is dismissed insofar as it relies on that same contention. *Id.* ¶¶ 152–155. Count three may continue only to the extent the defendants contend Shintech's nondisclosure of certain pipe affiliates constitutes a breach of good faith. *Id.* ¶¶ 140–151.

The court's finding that "PVC" means grades of polyvinyl-chloride resin also precludes some of Blue Cube's affirmative defenses. Dkt. 353 at 34–35. Blue Cube's affirmative defenses of unclean hands (no. 4), prior material breach (no. 8), fraud (no. 10), frustrated performance (no. 12), express terms (no. 13), and ambiguity (no. 15), fail to the extent those defenses are based on the meaning of "PVC" under the contract and Shintech's exclusion of downstream-product sales. *Id.*; Dkt. 292 at 84–86.

\*      \*      \*

The contract's plain language, context, and structure show "PVC" is unambiguous under the contract. By contrast, the defendants' interpretation is unsupported by the text and rests on extrinsic material that is inadmissible

under Texas law. Shintech's interpretation is reasonable; the defendants' interpretation is not.

The court grants Shintech's motion for partial summary judgment, Dkts. 342, 343, finding "PVC" means "grades of polyvinyl chloride resin." The court grants Shintech's declaratory-judgment claims nos. 3–6, Dkt. 393 ¶ 130, and dismisses counts 1–4 of Blue Cube's amended counterclaim and affirmative defenses nos. 4, 8, 10, 12, 13, and 15, Dkts. 278 ¶¶ 121–55; 292 at 84–86, to the extent such claims and defenses are predicated on the interpretation of "PVC" and Shintech's exclusion of sales of compounds and downstream products in the PVC-net-back calculation.[9]

It is so ordered.

Signed on Galveston Island this 18th day of August, 2025.


JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE

---

[9] The court denies the defendants' request "to at least give [them] the opportunity to prepare and offer a formal motion for summary judgment, just as . . . [Shintech] [has] had their opportunity to offer a formal motion for summary judgment on the definition of PVC." Dkt. 666 at 76:16–21. That ship has sailed. If the defendants believed their interpretation of "PVC" was the only reasonable one as a matter of law, they should have filed a cross motion when Shintech moved for summary judgment last August. Or at least before the dispositive-motion deadline passed on June 12.